## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

|  |  |
|---|---|
| NANCY TAYLOR<br>on behalf of herself and all others<br>similarly situated,<br><br>                  Plaintiffs,<br>   v.<br><br>SERVICE CORPORATION<br>INTERNATIONAL; SCI DIRECT, INC.;<br>SCI FUNERAL SERVICES OF FLORIDA,<br>LLC; S.E. COMBINED SERVICES OF<br>FLORIDA, LLC; NCS MARKETING<br>SERVICES, LLC; NEPTUNE SOCIETY<br>MANAGEMENT CORPORATION, and<br>JOHN DOES 1-20,<br><br>               Defendants. | Case No. 20-cv-60709<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nancy Taylor, on behalf of herself and all others similarly situated, sues Defendants Service Corporation International ("SCI"); SCI Direct Inc.; SCI Funeral Services of Florida, LLC; S.E. Combined Services of Florida, LLC; NCS Marketing Services, LLC; Neptune Society Management Corporation, and John Does 1-20 (collectively "SCI" or "Defendants") and alleges on information and belief in this class action complaint as follows:

### INTRODUCTION

1.      "Preplanning cremation is a gift of love for your family that allows you to live a richer and fuller life with one less thing to worry about…. In addition, by prearranging with National Cremation, you lock in today's prices. This means that your future won't be at the mercy of rising funerary prices."[1] Defendants tout these and other features as benefits of prepaid

---

[1] National Cremation, "Why Choose Cremation?" https://www.nationalcremation.com/why-choose-cremation (last visited March 15, 2020).

cremation services, including "peace of mind," "affordability," "simplicity," and "flexibility."[2] Recognizing that the prepaid nature of such services and the targeted audience of mostly senior citizens provide ripe grounds for exploitation, the State of Florida has enacted statutory protections regarding prepaid cremation services that require providers, like Defendants, to deposit a significant percentage of their customers' prepaid funds into a state-supervised trust for later disbursement. This case details how Defendants have intentionally evaded those statutory protections, thereby endangering the benefits paid for by Plaintiff and members of the proposed classes and restricting the refunds to which Plaintiff and members of the proposed classes are entitled in the event they later choose to cancel the contract.

2.      Approximately 200,000 Floridians die every year.[3] And tens of thousands of the over 5.5 million senior citizens[4] in the state of Florida plan for their inevitable deaths by prepaying for cremation services. These so-called "preneed contracts" allow consumers to purchase in advance (and at current costs) cremation services and related merchandise (urns, flowers, memorial guest books, etc.). Such agreements allow the purchaser to plan their own cremation arrangement and spare their loved ones from the expense and stress of managing the purchaser's cremation in the immediate aftermath of their death.

3.      Preneed cremation services, however, have inherent risks – specifically the risk that when the cremation services are needed years or even decades in the future, the service provider who sold the preneed agreement is no longer in business and is thus unable to perform the contracted-for services. Alternatively, a customer who bought preneed cremation services from a

---

[2] *Id.*
[3] *See* https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_09-508.pdf (at Table 12).
[4] *See* http://elderaffairs.state.fl.us/doea/pubs/stats/County_2018_projections/Counties/Florida.pdf (2018 estimate, defining senior citizen as anyone 60+).

specific provider in their local area may move to another part of the country (making the provider impractical for their cremation services) or may decide that they no longer wish to be cremated.

4.     To address these concerns, Florida passed laws regulating preneed contracts that require preneed service providers to place all (or a portion) of funds paid on a preneed contract within a trust. Under the statutory option elected by SCI in selling preneed contracts, SCI was required to deposit in a trust a minimum of:

      a.   70% of the purchase price for preneed cremation-related services;

      b.   100% of funds collected for fees that will need to be paid to third parties in the future; and

      c.   for undelivered merchandise, the greater of:

         i.   30% of the applicable merchandise retail sale price; or

        ii.   100% of the wholesale cost of such merchandise (as determined by Florida statutes).

Additionally, the purchaser is entitled by law to cancel the contract at any time and receive a refund of 100% of the purchase price of pre-need cremation services, undelivered merchandise, and of funds collected for fees to be paid to third parties in the future.

5.     Defendants – a group of related companies owned and operated by SCI, North America's largest seller and provider of funeral, cremation, and cemetery services – have wrongfully exploited the differential statutory treatment of preneed services and preneed merchandise to decrease the amount of money placed into trust, decrease the refund to which the purchaser is entitled when cancelling (thereby discouraging cancellations), and increase the amount of prepaid money it can put in its own pockets, all to create larger windfalls and immediate profits for Defendants and to the detriment of its customers. Despite advertising on their website

and elsewhere that "Your money is placed into a state-required trust fund," Defendants utilize a bait and switch to induce customers to enter into agreements in which a majority of their money is not placed into trust and is not refundable.

6.     The crux of this scheme is SCI's "Standard Neptune Plan" – a package that SCI advertises to customers as a bundled discount on a set of cremation services and merchandise compared to SCI's a la carte General Price List prices for those same services. SCI lures customers into purchasing the Standard Neptune Plan – virtually all of its cremation customers do – by charging them the same amount or a slightly higher amount than they would charge the customer for the purchase of just the cremation services. The sales pitch is that the customer will essentially receive the merchandise for free or for just a small increase in the price. But as outlined herein, the merchandise actually has high and hidden costs under the Standard Neptune Plan because the customer has significantly less money placed into trust and receives a substantially lower refund if they exercise their statutory right to cancel the contract in the future than they otherwise would.

7.     That is because when customers choose the Standard Neptune Plan, SCI requires them to execute two separate contracts – a Neptune Preneed Direct Cremation Package for services and a separate Neptune Memento Package of merchandise. Even though the wholesale cost of the merchandise is less than or equal to $25.00, and the actual retail value not much higher, SCI arbitrarily apportions the *majority* of the payments made under the Standard Neptune Plan ($1,000 or more) to the merchandise.

8.     As a direct result of this bookkeeping sleight-of-hand under the Standard Neptune Plan, SCI places in trust barely 50% of the amount it would be required to contribute for the sale of cremation services alone without the merchandise. Hence, SCI immediately increases its cash flow and bottom line.

4

9.      The result for consumers is quite the opposite. The Florida statutes mandate consumer refunds for prepaid services when cancelled, but not for delivered, prepaid merchandise. By allocating more than 50% of payments under the Standard Neptune Plan to merchandise, SCI reduces – by nearly half – the amounts consumers receive as a refund, the amount they can transfer to another funeral services provider, and the amounts placed in trust to protect consumers in the event of SCI's future default. SCI's bait-and-switch and deceptive sales and accounting practices related to the Standard Neptune Plan violate the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

10.      Furthermore, preneed cremation services are primarily (though not exclusively) purchased by those over the age of 60, including Plaintiff. Indeed, SCI's contracts under the Standard Neptune Plan require the consumer/beneficiary to indicate their date of birth. SCI's deceptive and unfair trade practices related to the Standard Neptune Plan therefore also qualify for FDUTPA's enhanced civil penalties (of up to $15,000 for each such violation) for "willfully using…a method, act, or practice in violation of [FDUTPA] which victimizes or attempts to victimize a senior citizen."

11.      Further, the actual fair market value of the merchandise sold to Neptune customers is, in and of itself, a deceptive and unfair trade practice. Neptune customers who purchase a preneed contract are not provided a sample of the applicable merchandise, nor are they provided an opportunity to examine any part of the merchandise prior to purchase. As a result, customers do not know that the retail fair market value of such merchandise is close to zero, and the written descriptions of such merchandise are, at best, grossly misleading.

12.      SCI compounds its deceptive practices by selling, as an addendum to the Standard Neptune Plan, a "Transportation and Relocation Protection Plan" that "protects the Beneficiary of

the Preneed Funeral Agreement from incurring additional out-of-pocket expenses if death occurs while beneficiary is traveling anywhere in the world or if Beneficiary relocates within the contiguous United States." The Transportation and Relocation Protection Plan is marketed as covering the logistics of dealing with cremating the purchaser's remains should they unexpectedly die outside of the service area of their SCI provider.

13.     SCI's practices in selling the "Transportation and Relocation Protection Plan" are unlawful, unfair, and deceptive in a manner that harms Florida consumers in at least two ways. First, SCI states on the "Transportation and Relocation Protection Plan" that it sells the plan as "a third party seller for MASA," or Medical Air Services Association of Florida, Inc. Yet, SCI conceals its own financial interest in selling this plan, creating the impression that the cost of the Transportation and Relocation Protection Plan is a pass-through fee in which SCI has no financial interest.

14.     In reality, SCI retains the majority of the cost these plans – a commission that it fails to disclose to consumers while instead providing them with the false net impression that all of their money is sent to MASA. This unlawful kickback harms consumers like Plaintiff, and SCI's acceptance of the kickback constitutes a separate violation of FDUTPA.

15.     Second, despite the Transportation and Relocation Protection Plan being a "service offered or provided in connection with the final disposition, memorialization, interment, entombment, or inurnment of human remains or cremated remains" under Fla. Stat. § 497.005(9), on information and belief SCI does not deposit the required 70% of the purchase price of the Transportation and Relocation Protection Plan within a preneed trust and, per the contract itself, limits full refunds on the Transportation and Relocation Protection Plan to only the first 30 days after the date of sale.

16.     All of these activities have harmed Plaintiff and the proposed classes of consumers under FDUTPA because SCI's misconduct has caused Plaintiff and each member of the proposed classes to have suffered: (a) reduced preneed amounts placed in trust for their benefit; (b) lower refundable amounts if they cancelled their preneed contract than what they should have been entitled to; and (c) out of pocket losses through the payment of undisclosed kickbacks on the sale of the Transportation and Relocation Protection Plan.

## PARTIES, JURISDICTION, AND VENUE

17.     Plaintiff Nancy L. Taylor is an individual who is a citizen and resident of West Palm Beach, Florida. At the time she purchased the Standard Neptune Plan and Transportation and Relocation Protection Plan from SCI, Ms. Taylor was 69 years old.

18.     Defendant Service Corporation International is a Texas corporation with its principal executive offices at 1929 Allen Parkway, Houston, Texas, 77019. During the times mentioned herein, Service Corp. conducted business throughout the state of Florida, including within Broward County, either directly or through control of one of its subsidiaries or alter egos.

19.     Defendant SCI Direct, Inc. is a Florida corporation with its principal executive offices at 1929 Allen Parkway, Houston, Texas, 77019 and its principal place of business in Florida at 1250 S. Pine Island Road, Suite 500, Plantation, Florida, 33324. SCI Direct, Inc. was formerly known as The Neptune Society, Inc. During the times mentioned herein, SCI Direct conducted business throughout the state of Florida, including within Broward County, either directly or through control of one of its subsidiaries or alter egos. SCI Direct is 100% owned by Service Corporation International, and is now, and at all times relevant to this action was, a subsidiary of Service Corporation International.

20.      Defendant SCI Funeral Services of Florida, LLC is a Florida limited liability company with its principal address at 1929 Allen Parkway, Houston, Texas, 77019. During the times mentioned herein, SCI Funeral Services of Florida conducted business throughout the state of Florida, either directly or through control of one of its subsidiaries or alter egos. SCI Funeral Services of Florida is now, and at all times relevant to this action was, a subsidiary of Service Corporation International.

21.      Defendant S.E. Combined Services of Florida, LLC is a Florida limited liability company with its principal address at 1929 Allen Parkway, Houston, Texas, 77019. During the times mentioned herein, S.E. Combined Services of Florida conducted business throughout the state of Florida, either directly or through control of one of its subsidiaries or alter egos. S.E. Combined Services of Florida is now, and at all times relevant to this action was, a subsidiary of Service Corporation International.

22.      Defendant S.E. Funeral Homes of Florida, LLC is a Florida limited liability company with its principal address at 1929 Allen Parkway, Houston, Texas, 77019. During the times mentioned herein, S.E. Funeral Homes of Florida conducted business throughout the state of Florida, either directly or through control of one of its subsidiaries or alter egos. S.E. Funeral Homes of Florida is now, and at all times relevant to this action was, a subsidiary of Service Corporation International.

23.      Defendant NCS Marketing Services, LLC is a Florida limited liability company with its principal address at 1929 Allen Parkway, Houston, Texas, 77019. During the times mentioned herein, NCS Marketing Services conducted business throughout the state of Florida, either directly or through control of one of its subsidiaries or alter egos. NCS Marketing Services

is now, and at all times relevant to this action was, a subsidiary of Service Corporation International.

24.     Defendant Neptune Society Management Corporation is a California corporation with its principal address at 1929 Allen Parkway, Houston, Texas, 77019. During the times mentioned herein, Neptune Society Management Corporation conducted business throughout the state of Florida, either directly or through control of one of its subsidiaries or alter egos. Neptune Society Management Corporation is now, and at all times relevant to this action was, a subsidiary of Service Corporation International.

25.     Defendants John Does 1-20 are SCI subsidiaries or affiliates offering prepaid cremation services and merchandise within the state of Florida.

26.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different from at least one Defendant.

27.     Defendants are subject to personal jurisdiction in the State of Florida because The Neptune Society, Inc., SCI Direct Inc., SCI Funeral Services of Florida, LLC, S.E. Combined Services of Florida, LLC, and NCS Marketing Services, LLC are citizens of Florida, and all Defendants regularly transact business in both Florida and this judicial district by, among other things, offering their services and the products in Florida and this judicial district either directly or through subsidiaries. In addition, SCI has committed tortious acts in this judicial district or directed such actions from its subsidiaries' and/or other Defendants' corporate offices located in this judicial district.

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because the Defendants' corporate offices are located in this district.

29.     Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events and/or omissions giving rise to Plaintiff's claims occurred in this district or were directed from this district.

30.     Finally, venue is proper under 28 U.S.C. § 1391(b)(3) as Defendants are subject to personal jurisdiction in this district and have committed tortious acts in this judicial district.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

I.     **Preneed Funeral Services and the Florida Statutes Governing Them**

31.     Funeral services, including cremation services, are sold in two ways: (1) "at-need" services are funeral services sold to survivors for the funeral of a loved one who has just died; and (2) "preneed" services are funeral services sold in advance for a specified beneficiary before that beneficiary's death.

32.     The consumer base for preneed services is dominated by senior citizens over the age of 60, who purchase preneed plans as part of estate and end-of-life planning. Indeed, preneed service providers such as SCI extensively market their services to senior citizens through online and print advertising. SCI websites for preneed services prominently feature pictures of silver-haired senior citizens, the target consumers for preneed services.

33.     When a Florida consumer purchases preneed funeral services, the consumer typically pays for or agrees to pay for the services at the time of purchase, either by full payment up-front or through an installment contract, even though services are not provided until the intended beneficiary has died.

34.     Fla. Stat. § 497.005(61) defines a preneed contract as "any arrangement or method, of which the provider of funeral merchandise or services has actual knowledge, whereby any

person agrees to furnish funeral merchandise or service in the future." These "preneed contracts" allow consumers to purchase in advance (and at current costs):

> a.  burial/cremation *services*, defined under Fla. Stat. § 497.005(9) as "any service offered or provided in connection with the final disposition, memorialization, interment, entombment, or inurnment of human remains or cremated remains"; and
>
> b.  burial/cremation *merchandise*, defined under Fla. Stat. §497.005(7) as "any personal property offered or sold by any person for use in connection with the final disposition, memorialization, interment, entombment, or inurnment of human remains or cremated remains, including, but not limited to, caskets, outer burial containers, alternative containers, cremation containers, cremation interment containers, urns, monuments, private mausoleums, flowers, benches, vases, acknowledgment cards, register books, memory folders, prayer cards, and clothing".

35.  Under applicable Florida statutes, there are two types of preneed trust contracts, *i.e.,* revocable and irrevocable. In the case of revocable preneed trusts, the purchaser has the right to (i) cancel the applicable contract at any time and receive a full refund of the purchase price for the preneed services (but not the merchandise or cash advance items already purchased or funds expended), or (ii) transfer the preneed services refund to a different funeral and/or cremation services provider. On the other hand, in the case of irrevocable trusts, purchasers have no right of cancellation, but retain only the right to transfer the preneed services refund to a different provider.

36.  Because consumers may purchase preneed funeral services years, or even decades, in advance of death, there is a significant risk that the services purchased will not be available

when needed. A funeral services provider might go out of business in the intervening years – a risk SCI itself is acutely aware of, as it petitioned the State of Florida's funeral board for permission to remove preneed trust funds during a time of financial distress in 2000.

37.     Alternatively, the needs or wishes of the beneficiary may change. The beneficiary might move out of the provider's service area and wish to establish a preneed contract with a funeral services provider in their new location, or they might wish to change the type of funeral (burial vs. cremation) for their remains and thus no longer desire the preneed services for which they paid. Other customers may simply decide that they want a different funeral home or cremation services provider to handle their cremation. Whether the applicable preneed contract is revocable or irrevocable, Florida law provides consumers the right to change their mind, for any reason at all, and move their preneed funds from one provider to another.

38.     In order to protect consumers in Florida from the risk of non-performance, and to provide consumers portability of prepaid services, Florida passed statutory protections designed to regulate the sale of preneed contracts for funeral, burial, and cremation services and merchandise. *See*, Florida Statutes, Chapter 497, Part IV. Included in these provisions are requirements that the bulk of the proceeds received for a preneed contract are placed in trust, with preneed providers able to select among various specific means for compliance.

39.     SCI placed the proceeds from preneed contracts in trust pursuant to Fla. Stat. § 497.458: "Any person who is paid, collects, or receives funds under a preneed contract for funeral services or merchandise or burial services or merchandise shall deposit an amount at least equal to the sum of 70 percent of the purchase price collected for all services sold and facilities rented; 100 percent of the purchase price collected for all cash advance items sold; and 30 percent of the

purchase price collected or 110 percent of the wholesale cost, whichever is greater, for each item of merchandise sold."[5]

40.     The Florida statute also sets refund terms for preneed contracts. Under Fla. Stat. § 497.459(1), a purchaser "may cancel a preneed contract within 30 days of the date that the contract was executed provided that the burial rights, merchandise, and services have not been used" and is "entitled to a complete refund of the amount paid, except for the amount allocable to any burial rights, merchandise or services that have been used."

41.     With respect to refunds sought after 30 days, the Florida statute differentiates between services and merchandise, again allowing a full refund for services, but limiting merchandise refunds to those items which the preneed provider cannot, or does not, deliver. *Compare,* Fla. Stat. § 497.459(2)(a) (entitles any purchaser of a preneed contract to "cancel the services, facilities, and cash advance items portions of a preneed contract at any time, and…be entitled to a full refund of the purchase price allocable to such items") *with* Fla. Stat. § 497.459(2)(b) (purchaser can "cancel the *merchandise* portion of a preneed contract" but is only "entitled to a full refund of the purchase price allocable to the specific item or items of merchandise that the preneed licensee *cannot or does not deliver*" (emphasis added)).

42.     In short, a Florida consumer who purchases a preneed cremation contract from SCI, but decides 31 days later that they want to be buried instead, can cancel the contract and receive a full refund of the amounts paid for cremation services – but they will not be entitled to a refund for the urn or other merchandise purchased so long as SCI delivers that merchandise at, or before, the time of cancellation.

---

[5] SCI's Standard Neptune Plan states that "Seller shall deposit into trust an amount at least equal to the sums of 70% of the purchase price collected for all services sold and facilities rented."

II.     **SCI's Bait-and-Switch**

43.     Aware of the above differences in Florida law, SCI engages in a series of deceptive and unfair practices to induce customers to purchase a plan that arbitrarily maximizes the upfront cash received by SCI while minimizing the amounts placed in trust and available for refund should customers decide to cancel.

44.     First, SCI prices a Direct Cremation, Standard Plan as somewhere in the range of $2,000-$2,300. This includes everything that is necessary for a cremation but without any merchandise. Were a customer to purchase this plan alone, 70% of the money would be placed into trust, and the customer would be entitled to a 100% refund at any time.

45.     Next, SCI provides a la carte prices for merchandise that are incredibly high: $498.00 for a memory chest, $329.00 for an urn, $199.00 for a keepsake plaque, and, remarkably, $185.00 for a "planning guide." The wholesale cost of these items is equal to, or less than, approximately $25 or less, and the fair market retail value not much higher. If SCI chooses to deliver these items to the customer upon or before cancellation, the customer is entitled to no refund for the merchandise. Few, if any, customers, purchase merchandise from SCI a la carte.

46.     Instead, almost all customers purchase the "Standard Neptune Plan," consisting of direct cremation services and all the merchandise listed above, for either the same price as, or a slightly higher ($100-$200) price than, the direct cremation services alone. By including vastly inflated figures in its price list for merchandise, SCI steers consumers towards this "Standard Neptune Plan," which provides this over-priced merchandise in combination with all of the ordinary and standard cremation services at what appears to be a bargain discount.

47.     As a result of these sales tactics, virtually all customers purchase the "Standard Neptune Plan." While Plaintiff does not yet have the figures for Florida, a recently filed complaint by the California Attorney General against SCI reveals that in California, a state in which SCI has

14

operations similar in scope to Florida and in which SCI engages in the same sales tactics, 99% of SCI's customers choose the "Standard Neptune Plan." The numbers are likely identical or substantially similar in Florida.

48.     Throughout this time period, the Standard Neptune Plan and its price were placed prominently on the first page of SCI's General Price List. The subsequent pages of the General Price List set forth itemized selections that customers can purchase a la carte under two categories: (1) "Services (Sold on a preneed basis)" and (2) "Merchandise." Each itemized selection has a listed price if purchased separately. These itemized pages of the General Price List also indicate (with an asterisk) the services and merchandise included in the Standard Neptune Plan. According to the General Price List, "[i]f purchased separately, total cost of these items [in the Standard Neptune Plan] is $3,607.00-$3,757.00."[6]

49.     Only at the time of contract signing does SCI reveal to the customer that the "Standard Neptune Plan"—marketed as a single package and a single transaction—will actually consist of two contracts: (1) a contract covering the cremation services that is substantially discounted from the price listed on the price sheet; and (2) a merchandise contract in which the customer will pay the full, vastly-inflated, list prices for the merchandise.

50.     SCI's practices create the impression that customers lose nothing, and gain valuable merchandise, by purchasing the Standard Neptune Plan in lieu of SCI's Direct Cremation Standard Plan. However, the reality is markedly different. By splitting the plan into two contracts, heavily discounting the services and vastly overcharging for the merchandise, SCI harms the customer by placing only a fraction of the value of the cremation services into trust.

---

[6] Note that this appears to be an error, as adding up the total costs using the higher $579 amount for "Transportation within our Service Area" would equal to $3,857.00, and not the $3,757.00 indicated.

51.     This practice not only reduces the protection afforded against SCI's default, it reduces the portability of the preneed contract because it results in a substantially lower refund should the customer cancel after 30 days. As the chart below illustrates, a customer purchasing the Standard Neptune Plan would have only $783.30 placed in trust against SCI's future default and would have only $1119.00 available for refund after 30 days. In contrast, a customer purchasing the identical set of cremation and shipping services (minus the merchandise) through a combination of the Direct Cremation Standard Plan plus Packaging and Shipping of Cremated Remains would have $1488.90 placed in trust and their full purchase price of $2,127.00 available for refund if they should move or choose to change providers.

52.     The following chart shows the prices, amounts paid in trust, and amounts subject to refund under: (1) the Standard Neptune Plan; (2) the Direct Cremation Standard Plan Plus Packaging and Shipping of Cremated Remains (which amounts to the same set of cremation services provided under the Standard Neptune Plan); and (3) the Price List prices for the same services and merchandise purchased a la carte.

| Services | Standard Neptune Plan | Direct Cremation, Standard Plan (Plus Packaging/Shipping Cremated Remains) ($) | General Price List A La Carte ($) |
|---|---|---|---|
| Basic Services of Funeral Director and Staff | Included | Included | 950.00 |
| Transportation within Service Area | Included | Included | 329.00 |
| Climate Controlled Holding Facility | Included | Included | 339.00 |
| Cremation/Crematory Fee | Included | Included | 359.00 |
| Alternative Container (Cardboard Receptacle) | Included | Included | 95.00 |
| **Non-Shipping Services Sub-Total** | | **1,977.00** | **2,072.00** |
| Packaging and Shipping Cremated Remains | Included | 150.00 | 150.00 |
| **All Services (incl. Shipping) Sub-Total** | | **2,127.00** | **2,222.00** |
| High Gloss Memento Chest | Included | | 498.00 |
| Urn (Brown Burl Finish or Biodegradable) | Included | | 329.00 |
| Forever Love Candle Plaque Keepsake | Included | | 199.00 |
| Thank You Cards (25) | Included | | 25.00 |
| A Planning Guide | Included | | 185.00 |
| Making Everlasting Memories (online memorial) | Included | | 149.00 |
| **Merchandise Sub-Total** | | | **1,385.00** |
| **Total Price of Plan[7]** | **2,504.00** | **2,127.00** | **3,607.00** |
| **Amounts Placed in Trust** (70% of Services, 30% of Non-Delivered Merchandise)[8] | **783.30** | **1,488.90** | **1,555.40** |
| **Amounts Refundable After 30 days** (100% of Services, 0% Delivered Merchandise) | **1,119.00** | **2,127.00** | **2,222.00** |

53.     This structure benefits and unjustly enriches SCI because it places only $783.30 into the trust for the entire package of services and merchandise. In contrast, if the same services are purchased under the Direct Cremation Standard Plan plus a la carte Packaging and Shipping of Remains, $1488.90 are placed into trust.

---

[7] Plan refers to: (1) the Standard Neptune Plan vs. (2) the Direct Cremation Standard Plan plus Packaging and Shipping of Cremated Remains (but no merchandise) vs. (3) purchasing all services/merchandise included in the Standard Neptune Plan a la carte based on General Price List prices.

[8] Because SCI delivers the merchandise to the consumer within 30 days of purchasing the Standard Neptune Plan, SCI is not required under statute to hold any amount from merchandise in trust, as the 30% requirement only applies to non-delivered merchandise.

54.     Consumers are injured because only a fraction of the true cost of cremation services are placed into trust and available to them if SCI should go bankrupt or default on the provision of services. Moreover, with respect to refunds after 30 days, purchasers of the Standard Neptune Plan will receive only $1,119.00 on their outlay of $2,504.00, while purchasers of the Direct Cremation Standard Plan plus a la carte Packaging and Shipping of Remains will receive 100% of the $1,977.00 they paid.

55.     To put this another way, SCI received $1,385.00 for the "merchandise" sold under its bait-and-switch – merchandise that had a *de minimis* wholesale cost to SCI and a value that was incidental at best to the consumer (as the merchandise was merely an add-on to the actual cremation services being purchased). This amount was not refundable even if the customer cancelled the preneed contract because the merchandise was delivered by SCI within weeks of signing.

56.     Thus, because of SCI's wrongful, deceptive, and unfair method of apportioning the Standard Neptune Plan discount, customers who purchased the Standard Neptune Plan paid approximately $1,200.00 for merchandise they would not have otherwise purchased.

57.     Notably missing from the General Price List or SCI's description of the Standard Neptune Plan is any statement that SCI will place far fewer funds ($783.30 versus $1,488.90) into a preneed, fully refundable trust under the Standard Neptune Plan as it would if the same services were purchased under the Direct Cremation Standard Plan plus Shipping. Nor is there any indication that the refund amount available under the Standard Neptune Plan ($1,119.00) is barely more than half that available under the Direct Cremation Standard Plan plus Shipping ($2,127.00).

58.     Rather, consumers are led to believe, by the General Price List as well as SCI's sale practices and marketing, that other than the purported savings they obtain through the purchase of

the Standard Neptune Plan, there is no difference between the Standard Neptune Plan and purchasing the stand-alone direct cremation services and merchandise a la carte via the General Price List.

59.     Indeed, SCI's brochure for the Standard Neptune Plan, provided to consumers in Florida, creates the opposite impression, stating that "Your pre-paid plan is protected" as "Your monies are placed into a state-required trust fund, held and invested for future need, in accordance with state law." The same brochure notes that SCI will provide a "Review of all state-regulated protections guaranteed to you."

60.     And yet SCI never discloses that consumers purchasing the Standard Neptune Plan do not receive the same trust treatment and amounts recoverable as a refund in the event of cancellation of the preneed contract as they would have if they had purchased the services and merchandise a la carte.

61.     SCI's deceptions do not stop there, for they further inform the customer that "You shall have 30 days from the execution of this agreement to cancel the agreement" and receive a full refund. That is not true, for Florida statute 497.459 provides that "A purchaser, by providing written notice to the preneed licensee, may cancel the services, facilities, and cash advance items portions of a preneed contract **at any time**, and shall be entitled to a full refund of the purchase price allocable to such items." (emphasis added).

62.     On information and belief, SCI repeated this bait-and-switch conduct across thousands (if not tens or hundreds of thousands) of Standard Neptune Plan contracts sold in the state of Florida during the Class Period.

63.     SCI's bait-and-switch and deceptive accounting related to the Standard Neptune Plan is a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

III.   **SCI's Bait-and-Switch Scheme With the Standard Neptune Plan was Knowingly and Willfully Targeted at Senior Citizens**

64.     As mentioned above, the primary consumers of preneed contracts, including SCI's Standard Neptune Plan, in the state of Florida are senior citizens over the age of 60.

65.     SCI actively and aggressively markets the Standard Neptune Plan to senior citizens on the internet and in other advertising.

66.     When consumers purchase a Standard Neptune Plan, they are required to provide the beneficiary's date of birth when filling out the Preneed Funeral Agreement/Neptune Preneed Direct Cremation Package.

67.     SCI therefore knows, at the time of sale, whether the beneficiary of the Standard Neptune Plan that is being purchased is over the age of sixty.

68.     Despite this knowledge, SCI continues to employ its bait-and-switch tactic in regards to the Standard Neptune Plan to the detriment of Floridian senior citizens.

69.     As such, SCI's violation of FDUTPA includes a violation of Fla. Stat. 501.2077, which states that a "person who is willfully using, or has willfully used, a method, act, or practice in violation of [FDUTPA] which victimizes or attempts to victimize a senior citizen or a person who has a disability is liable for a civil penalty of not more than $15,000 for each such violation if she or he knew or should have known that her or his conduct was unfair or deceptive."

70.     On information and belief, SCI repeated this bait-and-switch conduct across thousands (if not tens of thousands) of Standard Neptune Plan contracts sold to senior citizens in the state of Florida during the Class Period.

**IV.    SCI Collects An Illegal, Undisclosed Kickback for Sales of the Transportation and Relocation Protection Plan.**

71.    SCI's bait-and-switch regarding apportionment of the Standard Neptune Plan discount is not the only way by which SCI harms consumers in violation of FDUTPA in relation to preneed cremation services.

72.    Along with the Standard Neptune Plan, SCI also offers an additional "Transportation and Relocation Protection Plan" that "protects the Beneficiary of the Preneed Funeral Agreement from incurring additional out-of-pocket expenses if death occurs while Beneficiary is traveling anywhere in the world or if Beneficiary relocates within the contiguous United States."

73.    The Transportation and Relocation Protection Plan appears on the first page of SCI's General Price List, directly under the Standard Neptune Plan, and SCI advertises it as being "only offered at the time of prearrangement."

74.    The Transportation and Relocation Protection Plan was available for $549.00 according to SCI's General Price List effective as of June 1, 2019.

75.    In the event a beneficiary travels outside of the 75-mile radius of the beneficiary's home and dies, the Transportation and Relocation Protection Plan protects the beneficiary from the costs involved in returning the beneficiary's body or remains to the local service provider for further cremation services (and/or in arranging to provide those same services at the location where the beneficiary is traveling before transporting the remains back to the local service provider).

76.    SCI forces every customer who purchases a preneed contract to elect to either purchase or decline to purchase the Transportation and Relocation Protection Plan – a box on the Transportation and Relocation Protection Plan contract is included for the preneed customer to decline the plan by writing their initials, which states: "I hereby decline the above mentioned Plan.

In the event that death of Beneficiary occurs outside of Neptune's Service Area, I understand that there will be additional charges. **Furthermore, I understand that I will not have the opportunity to purchase this Plan at a later date.**" (Emphasis in original.) This representation is false, as in actuality, a customer could purchase this or an identical plan at a later date.

77.    This contract language and the marketing of the Transportation and Relocation Protection Plan is intended to create the net impression that the Transportation and Relocation Protection Plan is in the preneed customer's best interest and that there is some requirement that the customer must decide now whether or not to purchase the plan.

78.    And because SCI sells the Transportation and Relocation Protection Plan along with and at the same time that it sells the Standard Neptune Plan, it is aware whether the beneficiary of the plan being purchased is a senior citizen over the age of 60, as purchase of the Standard Neptune Plan requires the purchaser to indicate the beneficiary's date of birth.

79.    According to the Transportation and Relocation Protection Plan, SCI "is a third party seller for MASA" – or Medical Air Services Association of Florida, Inc.

80.    Indeed, the contract language for the plan requires the purchaser, when signing, to "acknowledge that [the Transportation and Relocation Protection Plan] is being sold separately on behalf of MASA on its own independent contract. Coverage begins at the time of contracting and it is not considered part of any other contract nor is it a trust funded preneed funeral service or good."

81.    Furthermore, the contract language for the plan states that if the consumer cancels their preneed funeral agreement with SCI, the Transportation and Relocation Protection Plan is "portable through MASA to any new preneed funeral service provider."

82.     At no point in its marketing or in the contract language of the Transportation and Relocation Protection Plan does SCI indicate that it receives a kickback for the sale of the plan.

83.     Indeed, the contract language above creates and is intended to create the false net impression in the consumer that the price of the Transportation and Relocation Protection Plan is a pass-through fee, *i.e.*, a fee that is passed on to another entity (in this case MASA) and for which SCI has no purported financial interest.

84.     The net impression of SCI's representations and omissions to consumers is that, when consumers purchase the Transportation and Relocation Protection Plan, the funds to cover the plan's costs go to MASA.

85.     The net impression of all of SCI's representations and omissions to its customers during the purchase process – including the language in the contract of the Transportation and Relocation Protection Plan itself – is that the cost of the plan is a pass-through fee, where SCI merely collects the money for the plan from the consumer and forwards it on to the actual provider MASA, without any profit interest in the fee.

86.     However, SCI retains or ultimately receives an undisclosed kickback of between 50-65% of the total cost for every Transportation and Relocation Protection Plan sold on behalf of MASA in violation of FDUTPA.

87.     As the price of the Transportation and Relocation Protection Plan includes this illegal kickback paid to SCI, consumers (including Plaintiff and members of the Transportation and Relocation Protection Plan Purchaser Class) who bought the Transportation and Relocation Protection Plan were overcharged by the amount of the illegal kickback. Plaintiff and the class members are entitled to a full return of the kickbacks to SCI they unknowingly paid.

88.     SCI has never disclosed to Plaintiff, or any of the class members, the true nature of its relationship with MASA, and specifically has not disclosed the fact that it retains or receives a substantial kickback on the Transportation and Relocation Protection Plans it sells.

89.     These activities have harmed Plaintiff and the proposed class of consumers while benefiting SCI. On information and belief, SCI has been paid or retained millions of dollars in illegal kickbacks as part of its sale of the Transportation and Relocation Protection Plans to thousands (if not tens or hundreds of thousands) of Florida consumers.

**V.      Plaintiff Was Harmed By SCI When She Purchased a Standard Neptune Plan and Transportation and Relocation Protection Plan.**

90.     Plaintiff Nancy Taylor purchased a Standard Neptune Plan and Transportation and Relocation Protection Plan from SCI on approximately August 15, 2017.

91.     At the time of purchase of the Standard Neptune Plan and Transportation and Relocation Protection Plan, Plaintiff was 69 years old. Plaintiff disclosed this fact to SCI by providing her date of birth (May 6, 1948) on forms she filled out for SCI when buying the plans.

92.     At the time of Plaintiff's purchase, SCI's General Price list advertised the Standard Neptune Plan with a price of $2,344.00, and the Transportation and Relocation Protection Plan with a price of $499.00, for a total cost of $2,843.00.

93.     Because Plaintiff paid in full at the time of purchase and purchased both the Standard Neptune Plan and the Transportation and Relocation Protection Plan, she was able to negotiate additional adjustments and discounts from SCI, and thus paid a total of $2,643.00, broken down as follows: $1,030.05 for services, $1,149.05 for merchandise, and $463.90 for the Transportation and Relocation Protection Plan.

94.     Upon information and belief, the $200 discount from the $2,843.00 price equaled the $200 processing fee that SCI typically charged customers.

95.     Thus, via its sales and marketing practices and contractual bait-and-switch, SCI was able to induce Plaintiff to purchase the "Standard Neptune Plan" and then have her sign contracts that vastly inflated the value of the merchandise she was provided, vastly decreased the amount of money that was put into trust on her behalf, and vastly reduced the amount of money to which she would be entitled in the event she cancelled the contract (while also telling her that she had to cancel within 30 days even though Florida law permits her to cancel at any time).

96.     Plaintiff also purchased a Transportation and Relocation Protection Plan from SCI (as third-party seller for MASA) on approximately August 15, 2017, and paid $463.90 for that plan.

97.     Upon information and belief, between 50-65% of that $463.90 price constituted an illegal kickback that SCI retained or MASA paid, and to which SCI was not legally entitled to receive or retain.

## CLASS ACTION ALLEGATIONS

98.     Plaintiff brings this lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23.

### Class Definition

99.     Plaintiff seeks to represent the following classes:

Standard Neptune Plan Purchasers Class
All persons who (a) within four (4) years of the present purchased a Standard Neptune Plan from SCI within the state of Florida or (b) made a payment on a Standard Neptune Plan purchased from SCI within the state of Florida within 2 years of the present (the "Class Period"), excluding all Standard Neptune Plans for which SCI has performed the contracted for cremation services.

Transportation and Relocation Protection Plan Purchasers Class
All persons who purchased a Transportation and Relocation Protection Plan from SCI within the state of Florida within four (4) years of the present or made a payment on a Transportation and Relocation Protection Plan purchased from SCI within the state of Florida within 2 years of the present (the "Class Period").

Excluded from these classes are SCI, its affiliates, subsidiaries, agents, board members, directors, officers, and employees. Also excluded from the class are the district judge and magistrate judge assigned to this case, their staff, and their immediate family members.

100.    This class action is brought pursuant to Rule 23(b)(1)(A) because inconsistent or varying adjudications with respect to individual class members could establish incompatible standards of conduct for SCI.

101.    This class action also brought pursuant to Rule 23(b)(2) because SCI has acted or refused to act on grounds generally applicable to all the members of the class, thereby making final injunctive relief or declaratory relief concerning the class appropriate.

102.    This class action is also brought pursuant to Rule 23(b)(3) because the questions of law or fact common to Plaintiff's claim and the class members' claims predominate over any question of law or fact affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

103.    SCI has subjected Plaintiff and the members of the classes to the same unfair, unlawful, and deceptive practices and harmed them in the same manner. The conduct described above is SCI's standard business practice.

104.    All of the members of the class, by transacting with SCI, were subject to the same choice of law provisions within the Standard Neptune Plan and/or Transportation and Relocation Protection Plan dictating that any disputes over transactions between customers and SCI related to those agreements were to be "governed by the laws of the State of Florida." All of the members of the class also transacted with SCI within the state of Florida as Florida consumers.

**A.      Numerosity**

105.    The individual class members are so numerous that joinder of all members in a single action is impracticable. SCI has sold thousands of Standard Neptune Plans and/or Transportation and Relocation Protection Plans to Florida consumers during the Class Period.

106.    While Plaintiff estimates the proposed class members are in the thousands, the exact number of class members, as well as the class members' names and addresses, can be identified from SCI's business records.

**B.    Commonality/Predominance**

107.    Common questions of law and fact exist as to Plaintiff's and the class members' claims. These common questions predominate over any questions solely affecting individual class members, including, but not limited to, the following:

a.    Whether SCI engaged in a deceptive and unfair business practice by misleading the Standard Neptune Plan Purchasers Class about the Standard Neptune Plan being one discounted agreement, only to then execute it via two separate contracts where the discount was nearly entirely apportioned to the services portion of the agreement, resulting in a lower (potential or actual) refundable amount for the customer and less funds placed in trust by SCI for the preneed cremation services;

b.    Whether SCI willfully used the deceptive and unfair business practices alleged in regards to the Standard Neptune Plan with knowledge that Plaintiff and members of the Standard Neptune Plan Purchasers Class were over the age of 60;

c.    Whether SCI receives undisclosed and illegal kickbacks from the sale of the Transportation and Relocation Protection Plan;

      d.      Whether the representations and omissions made about the Transportation and Relocation Protection Plan costs collected by SCI would lead the reasonable customer to believe it was a pass-through fee that SCI was paying to MASA;

      e.      Whether SCI willfully used the deceptive and unfair business practices alleged in regards to the Transportation and Protection Plan with knowledge that Plaintiff and members of the Transportation and Protection Plan were over the age of 60;

      f.      Whether and to what extent SCI's conduct has caused injury to the Plaintiff and the members of the classes; and

      g.      Whether SCI unlawfully enriched itself at the expense of the classes.

**C.**    **Typicality**

108.    Plaintiff's claims are typical of the putative classes' members' claims because of the similarity, uniformity, and common purpose of SCI's unlawful conduct. Plaintiff, like all Standard Neptune Plan Purchaser class members, was damaged through SCI apportioning her payment of money for a preneed cremation contract in a manner that reduced both the portion of that payment that was held in trust and the portion that would be refundable. Likewise, Plaintiff, like all Transportation and Relocation Protection Plan Purchaser class members, was damaged through her payment of money to SCI that SCI deceptively presented as a pass-through fee to MASA, when in fact SCI enriched itself in this process, collecting an illegal kickback.

109.    Each member of Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of SCI's wrongful and deceptive conduct.

**D.**    **Adequacy**

110.    Plaintiff will fairly and adequately protect and represent the interest of each member of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class because she has suffered the same wrongs as the respective class members.

111.    Plaintiff is fully cognizant of her responsibilities as class representative and has retained Korein Tillery LLC and León Cosgrove LLP to prosecute this case. Korein Tillery and León Cosgrove are experienced in complex class action litigation, including litigation related to unfair and deceptive trade practices, and have the financial and legal resources to meet the costs of and understand the legal issues associated with this type of litigation.

112.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein because such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

**E.      The Prerequisites of Rule 23(b)(1)(A) Are Satisfied.**

113.    The prerequisites to maintaining a class action pursuant to Federal Rule of Civil Procedure 23(b)(1)(A) is satisfied because prosecuting separate actions by individual class members against SCI would create a risk of inconsistent or varying adjudications with respect to individual class members that could establish incompatible standards of conduct for SCI as the party opposing the class.

**F.      The Prerequisites of Rule 23(b)(2) Are Satisfied.**

114.    The prerequisites to maintaining a class action for injunctive and equitable relief pursuant to Federal Rule of Civil Procedure 23(b)(2) exist as SCI has acted or refused to act on

grounds generally applicable to the classes, thereby making appropriate final injunctive and equitable relief with respect to the classes as a whole.

115.    SCI's actions are generally applicable to the classes as a whole, and Plaintiff seeks, among other things, equitable remedies with respect to the classes as a whole.

**F.      The Prerequisites of Rule 23(b)(3) Are Satisfied.**

116.    The questions of law and fact enumerated above predominate over questions affecting only individual members of the classes, and class actions are the superior method for fair and efficient adjudication of the controversy.

117.    The likelihood that individual members of the classes will prosecute separate actions, and their interest in so doing, is small due to the extensive time and considerable expense necessary to conduct such litigation.

118.    This action will be prosecuted in a fashion to ensure the Court's able management of this case as class actions on behalf of the classes. Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as class actions.

<u>**COUNT I**</u>
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")**

119.    Plaintiff incorporates the preceding allegations as if fully set forth herein and further alleges the following.

120.    This count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

121.     At all times material hereto, Plaintiff and all members of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class were

consumers within the meaning of Fla. Stat. § 501.203, and are entitled to relief under FDUTPA in accordance with Fla. Stat. § 501.211.

122.    At all times material hereto, SCI conducted trade and commerce within the meaning of Fla. Stat. § 501.203.

123.    SCI has engaged in unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices alleged above.

124.    The misrepresentations, deceptions, and concealment and omissions of material facts alleged in the preceding paragraphs occurred in connection with SCI's trade and commerce in Florida.

125.    SCI's unfair and deceptive acts and practices violate FDUTPA, Fla. Stat. §§ 501.201 and 501.211.

126.    SCI was also aware that its unfair and deceptive acts and practices in violation of FDUTPA were directed at senior citizens, insofar as it marketed the Standard Neptune Plan and the Transportation and Relocation Protection Plan to senior citizens over the age of 60, and had knowledge that customers to which it was selling the plans were themselves over the age of 60 because the forms that customers filled out required them to provide the beneficiary's date of birth.

127.    As a direct and proximate result of SCI's FDUTPA violations, Plaintiff and members of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class have been damaged in an amount to be proven at trial, and have monetary, out-of-pocket losses or potential losses for which they are entitled to damages and/or injunctive relief, as they paid money to SCI as a result of its deceptive conduct.

128.    Plaintiff and members of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class are entitled to actual damages,

declaratory and injunctive relief, attorneys' fees and costs, and all other remedies available under FDUTPA.

129. Furthermore, civil penalties under Fla. Stat. § 501.2077 in an amount not to exceed $15,000 for each such violation against Plaintiff and all other senior citizen members of the classes should be assessed against SCI, and made payable as required to "the Legal Affairs Revolving Trust Fund of the Department of Legal Affairs and allocated solely to the Department of Legal Affairs for the purpose of preparing and distributing consumer education materials, programs, and seminars to benefit senior citizens, persons who have a disability, and military service members or to further enforcement efforts."

## COUNT II
## UNJUST ENRICHMENT

130. Plaintiff incorporates the preceding allegations as if fully set forth herein and further alleges the following.

131. Plaintiff and each member of the Standard Neptune Plan Purchaser class conferred a direct benefit on SCI through their payment for a preneed contract, which SCI enriched itself with to the detriment of the class by wrongfully attributing an excessive amount of that payment towards non-refundable "merchandise" rather than towards refundable "services," which would have been required to have 70% of which held in trust.

132. The contracts that SCI required Plaintiff and each member of the Standard Neptune Plan Purchaser class to execute as part of their purchase of the Standard Neptune Plan are void as against public policy, insofar as they conflict with and frustrate the purposes of Florida statutes, specifically Fla. Stat. §§ 497.450-497.468, which govern the sale of preneed cremation contracts,

the trust treatment of funds received for preneed cremation contracts, and the refunds of such funds in the event of cancellation.

133.    Plaintiff and each member of the Transportation and Relocation Protection Plan Purchaser class conferred a direct benefit on SCI through their payment for the Transportation and Relocation Protection Plan, a portion of which SCI wrongfully retained as an illegal kickback and which it enriched itself with to the detriment of the class.

134.    The contract that SCI required Plaintiff and each member of the Transportation and Relocation Protection Plan Purchaser class to execute as part of their purchase of the Transportation and Relocation Protection Plan is void as against public policy, insofar as SCI failed to disclose to customers that it was receiving a kickback on each sale of the plan and mislead customers into believing that the cost of the plan was a pass-through of MASA's costs directly to the customers.

135.    SCI appreciated, accepted, and retained these benefits from the Standard Neptune Plan and Transportation and Relocation Protection Plan, as it garnered substantial profits by virtue of these schemes.

136.    Under the circumstances, it would be unjust and inequitable to allow SCI to retain these benefits, as they were obtained through deceptive representations and illegal conduct.

137.    Independently, it would also be unjust and inequitable to allow SCI to retain the kickbacks from the sale of the Transportation and Relocation Protection Plan to the Transportation and Relocation Protection Plan Purchaser class because SCI is not legally entitled to receive these kickbacks under Florida law.

138.    Plaintiff and the class suffered damages as a result of SCI's unjust enrichment.

**PRAYER FOR RELIEF**

Named Plaintiff and the plaintiff class request the following relief:

a.  Certification of the class;

b.  A jury trial and judgment against SCI;

c.  An order requiring SCI to make an accounting of all preneed contracts that it entered into with the Standard Neptune Plan Purchaser class, and to reapportion the amounts collected properly between fully refundable services and merchandise and deposit such funds as necessary following such an accounting in trust;

d.  An order entitling every member of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class to rescission of their agreements and restitution of the full purchase price of said plans (minus the wholesale cost to SCI of any merchandise provided), at the option of the classes' members;

e.  An order refunding the amounts paid on behalf of any merchandise for any class member who cancelled their prepaid cremation services within the class period;

f.  An order requiring SCI to make full disclosure to consumers of its receipt or retention of kickbacks from the sale of the Transportation and Relocation Protection Plan, and the amount of such kickbacks;

g.  The costs of suit, including reasonable attorneys' fees, in accordance with FDUTPA and otherwise;

h.  General, actual, and compensatory and exemplary damages in an amount to be determined at trial, including but not limited to the civil penalties authorized

under Fla. Stat. § 501.2077 for each violation involving a senior citizen over the age of 60;

i.  Restitution of the amount SCI was unjustly enriched as a result of the wrongs alleged herein, in an amount to be determined at trial;

j.  Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law; and

k.  Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial as to all claims so triable.

Dated: April 6, 2020                              Respectfully submitted,

*/s/ Randall P. Ewing, Jr.*
Randall P. Ewing, Jr. (Fla. Bar No. 76879)
Chad E. Bell
KOREIN TILLERY LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Phone: (312) 641-9750
Fax: (312) 641-9751
rewing@koreintillery.com
cbell@koreintillery.com

Carol L. O'Keefe
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Phone: (314) 241-4844
cokeefe@koreintillery.com


Alec H. Schultz (Fla. Bar No. 35022)
John R. Byrne (Fla. Bar No. 126294)
Jeremy L. Kahn (Fla. Bar No. 105277)
LEÓN COSGROVE, LLP
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Tel: (305) 740-1975

aschultz@leoncosgrove.com
jbyrne@leoncosgrove.com
jkahn@leoncosgrove.com

*Counsel for Plaintiff and Classes*