**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| NANCY TAYLOR<br>on behalf of herself and all others<br>similarly situated,<br><br>                         **Plaintiffs,**<br>   v.<br><br>SERVICE CORPORATION<br>INTERNATIONAL; SCI DIRECT, INC.<br>(f.k.a. THE NEPTUNE SOCIETY, INC.);<br>NEPTUNE SOCIETY MANAGEMENT<br>CORPORATION, and JOHN DOES 1-20,<br><br>                    **Defendants.** | Case No. 20-cv-60709<br><br>**<u>CLASS ACTION</u>**<br><br>**JURY TRIAL DEMANDED** |

**<u>AMENDED COMPLAINT</u>**

Plaintiff Nancy Taylor, on behalf of herself and all others similarly situated, sues Defendants Service Corporation International ("Service Corp."); SCI Direct Inc. (f.k.a. The Neptune Society, Inc.) ("SCI Direct"); Neptune Society Management Corporation (individually "NSMC" and together with SCI Direct "Neptune Society"); and John Does 1-20 (collectively "Defendants"), alleging on personal knowledge and otherwise on information and belief in this class action complaint as follows:

**<u>INTRODUCTION</u>**

1.     "Preplanning cremation is a gift of love for your family that allows you to live a richer and fuller life with one less thing to worry about…. In addition, by prearranging with National Cremation, you lock in today's prices. This means that your future won't be at the mercy

of rising funerary prices."[1] Defendants tout these and other features in their respective advertising and websites as benefits of prepaid cremation services, including "peace of mind," "affordability," "simplicity," and "flexibility."[2] Recognizing that the prepaid nature of such services and the targeted audience of mostly senior citizens provide ripe grounds for exploitation, the State of Florida has enacted statutory protections regarding prepaid cremation services that require providers, like Defendants, to deposit a significant percentage of their customers' prepaid funds into a state-supervised trust for later disbursement. This case details how Defendants have intentionally evaded those statutory protections, thereby endangering the benefits paid for by Plaintiff and members of the proposed classes and restricting the refunds to which Plaintiff and members of the proposed classes are entitled in the event they later choose to cancel the contract.

2.    Approximately 200,000 Floridians die every year.[3] And tens of thousands of the over 5.5 million senior citizens[4] in the State of Florida plan for their inevitable deaths by prepaying for cremation services. These so-called "preneed contracts" allow consumers to purchase in advance (and at current costs) cremation services and related merchandise (urns, flowers, memorial guest books, etc.). Such agreements allow the purchaser to plan their own cremation arrangement and spare their loved ones from the expense and stress of managing the purchaser's cremation in the immediate aftermath of their death.

3.    Preneed cremation services, however, have inherent risks – specifically the risk that when the cremation services are needed years or even decades in the future, the service provider

---

[1] National Cremation, "Why Choose Cremation?" https://www.nationalcremation.com/why-choose-cremation (last visited March 15, 2020).
[2] *Id.*
[3] *See* https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_09-508.pdf (at Table 12).
[4] *See* http://elderaffairs.state.fl.us/doea/pubs/stats/County_2018_projections/Counties/Florida.pdf (2018 estimate, defining senior citizen as anyone 60+).

who sold the preneed agreement is no longer in business and is thus unable to perform the contracted-for services. Alternatively, a customer who bought preneed cremation services from a specific provider in their local area may move to another part of the country (making the provider impractical for their cremation services) or may decide that they no longer wish to be cremated, making it important to customers purchasing preneed cremation services to be entitled to a refund (and to understand how much of their purchase price is refundable) if they cancel because their life circumstances change.

4.       To address these concerns, Florida passed laws regulating preneed contracts that require preneed service providers to place all (or a portion) of funds paid on a preneed contract within a trust. Under the statutory option elected by Defendants in selling preneed contracts, Defendants were required to deposit in a trust a minimum of:

     a.   70% of the purchase price for preneed cremation-related services;

     b.   100% of funds collected for cash advance items (including taxes, fees, gratuities and other out-of-pocket expenses which will be paid to third parties); and

     c.   for undelivered merchandise, the greater of:

         i.   30% of the applicable merchandise retail sale price; or

        ii.   100% of the wholesale cost of such merchandise (as determined by Florida statutes).

Additionally, the purchaser is entitled by law to cancel the contract at any time and receive a refund of 100% of the purchase price of preneed cremation services.

5.       Defendants—a group of related companies acting in concert, which are owned, operated, and directed by Service Corp., North America's largest seller and provider of funeral, cremation, and cemetery services—have wrongfully exploited the differential statutory treatment

of preneed cremation services and preneed merchandise in Florida to decrease the amount of money placed into trust, decrease the refund amount on preneed cremation services to which the purchaser is entitled when cancelling (thereby discouraging cancellations), and increase the amount of prepaid money it can put in its own pockets, all to create larger windfalls and immediate profits for Defendants and all to the detriment of their customers. Despite advertising on Service Corp. owned and controlled websites, Neptune Society's websites, and elsewhere that "Your money is placed into a state-required trust fund," Defendants utilize a bait-and-switch to induce customers to enter into agreements in which a majority of their money is not placed into trust and is not refundable.

6.     The crux of this scheme is Neptune Society's "Standard Neptune Plan"—a package that Defendants advertise on their respective websites and elsewhere to customers as a bundled discount on a set of cremation services and merchandise compared to Defendants' a la carte General Price List prices for those same services and compared to Defendants' Direct Cremation Plan. Defendants lure customers into purchasing the Standard Neptune Plan offered by Neptune Society—virtually all of its preneed cremation customers do—by charging the same or slightly more than the customer would ordinarily pay for just the cremation services. However, through the ruse of the Standard Neptune Plan, Defendants artificially and dramatically reallocate over half the price of the entire transaction from fully-refundable cremation services to 30-day non-refundable merchandise. The net result? Consumer refunds are cut nearly in half if they choose to cancel the contract after 30 days. In contrast, once that 30-day period expires, Defendants can now immediately book over $1,300 more than they could have if the customer purchased just the cremation services, utterly free from the trust requirement or any risk of refund due to cancellation.

7.     Defendants' sales pitch is that the customer will essentially receive the merchandise for free or for just a small increase in the price. But as outlined herein, the merchandise actually has high and hidden costs under the Standard Neptune Plan because customers are precluded from recouping the true value of their preneed cremation services if they exercise their statutory right to cancel the contract in the future. Should customers decide they need to cancel (because, for example, they relocate away from the State of Florida and Defendants' service area to live near family elsewhere as they age), Defendants' scheme leaves them with a smaller amount available as a refund.

8.     When customers choose the Standard Neptune Plan, Defendants require them to execute two separate but tied contracts with Neptune Society—a Neptune Preneed Direct Cremation Package for services under a "Preneed Funeral Agreement" and a separate "Retail Merchandise Agreement" for the Neptune Memento Package of merchandise. Even though the wholesale cost of the merchandise is less than or equal to $25.00, and the actual retail value not much higher, Defendants then arbitrarily apportion the *majority* of the payments made under the Standard Neptune Plan ($1,000 or more) to the merchandise.

9.     As a direct result of this bookkeeping sleight-of-hand under the Standard Neptune Plan, Defendants place in trust barely 50% of the amount they would be required to contribute for the sale of cremation services alone without the merchandise. Hence, Defendants immediately increases their cash flow and bottom line.

10.     The result for consumers is quite the opposite. The Florida statutes mandate consumer refunds for prepaid services when cancelled, but not for delivered, prepaid merchandise. By allocating more than 50% of payments under the Standard Neptune Plan to merchandise, Defendants reduce—by nearly half—the amounts consumers can receive as a refund in the event

5

of cancellation beyond 30 days, the amount they can transfer to another funeral services provider, and the amounts placed in trust to protect consumers in the event of Defendants' future default.

11.     Nor can customers keep just the prepaid services under the Standard Neptune Plan and return the merchandise for a full refund on the merchandise's listed price (something permitted under Florida law within 30 days of executing an agreement). Defendants foreclose such an avenue by inserting a clause into Neptune Society's Retail Merchandise Agreement that a return of merchandise cancels not only the Retail Merchandise Agreement, but also the ostensibly separate Preneed Funeral Agreement—"Your return pursuant to this section is the cancellation of this Agreement *and also operates as Purchaser's written request to cancel their Preneed Funeral Agreement*, unless the Preneed Funeral Agreement has been made irrevocable." (Emphasis added.)

12.     The Neptune Society contracts that Defendants required Plaintiff and class members to execute as part of their purchase of the Standard Neptune Plan are void as against public policy, insofar as they conflict with and frustrate the purposes of Florida statutes, specifically Fla. Stat. §§ 497.450-497.468, which govern the sale of preneed cremation contracts, the trust treatment of funds received for preneed cremation contracts, and the refunds of such funds in the event of cancellation.

13.     Defendants' bait-and-switch and deceptive sales and accounting practices related to the Standard Neptune Plan violate the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and the Florida Funeral, Cemetery, and Consumer Services Act.

14.     Furthermore, preneed cremation services are primarily (though not exclusively) purchased by those over the age of 60, including Plaintiff. Indeed, the Neptune Society contracts customers are required to execute under the Standard Neptune Plan require the

consumer/beneficiary to indicate their date of birth. Defendants' deceptive and unfair trade practices related to the Standard Neptune Plan therefore also qualify for FDUTPA's enhanced civil penalties (of up to $15,000 for each such violation) for "willfully using… a method, act, or practice in violation of [FDUTPA] which victimizes or attempts to victimize a senior citizen."

15.     Additionally, the actual fair-market value of the merchandise sold to customers is, in and of itself, a deceptive and unfair trade practice. Customers who purchase a preneed contract with Neptune Society from Defendants are not provided a sample of the applicable merchandise, nor are they provided an opportunity to examine any part of the merchandise prior to purchase. As a result, customers do not know that the retail fair market value of such merchandise is close to zero, and the written descriptions of such merchandise are, at best, grossly misleading.

16.     Defendants compound their deceptive practices by selling, as an addendum to the Standard Neptune Plan, a "Transportation and Relocation Protection Plan" that "protects the Beneficiary of the Preneed Funeral Agreement from incurring additional out-of-pocket expenses if death occurs while beneficiary is traveling anywhere in the world or if Beneficiary relocates within the contiguous United States." The Transportation and Relocation Protection Plan is marketed as covering the logistics of dealing with cremating the purchaser's remains should they unexpectedly die outside of the service area of one of Defendants' providers.

17.     Defendants' practices in selling the "Transportation and Relocation Protection Plan" are unlawful, unfair, and deceptive in a manner that harms Florida consumers in at least two ways. First, the "Transportation and Relocation Protection Plan" states that "Neptune Society is a third party seller for MASA," or Medical Air Services Association of Florida, Inc., for the Plan. Yet, Defendants conceals their own financial interest in selling this plan, creating the impression

that the cost of the Transportation and Relocation Protection Plan is a pass-through fee in which Defendants have no financial interest.

18.     In reality, when Defendants sell a Transportation and Relocation Protection Plan, they collect the money from the customer and then pay MASA a set rate (less than $165, or 1/3 of the standard amount charged), regardless of how much Defendants charged the customer. On information and belief, the portion that Defendants retain is the majority of the cost charged to the customer for these plans, constituting a financial interest that Defendants fail to disclose to consumers, all while instead providing the false net impression that all of their money is sent to MASA. Defendants collecting the Transportation and Relocation Protection plan fee charged to the customer, and then paying MASA a set rate for the plan regardless of what Defendants charged the customer, harms consumers like Plaintiff, and Defendants' retention of that undisclosed financial interest constitutes a separate violation of FDUTPA.

19.     Second, despite the Transportation and Relocation Protection Plan being a "service offered or provided in connection with the final disposition, memorialization, interment, entombment, or inurnment of human remains or cremated remains" under Fla. Stat. § 497.005(9), on information and belief Defendants do not deposit the required 70% of the purchase price of the Transportation and Relocation Protection Plan within a preneed trust and, per the contract itself, limits full refunds on the Transportation and Relocation Protection Plan to only the first 30 days after the date of sale.

20.     All of these activities have harmed Plaintiff and the proposed classes of consumers under FDUTPA and the Funeral, Cemetery, and Consumer Services Act because Defendants' misconduct has caused Plaintiff and each member of the proposed classes to have suffered: (a) reduced preneed amounts placed in trust for their benefit; (b) lower refundable amounts if they

cancelled their preneed contract than what they should have been entitled to; and (c) out-of-pocket losses through the undisclosed receipt by Neptune Society of a substantial amount of the price paid for the Transportation and Relocation Protection Plan.

## PARTIES, JURISDICTION, AND VENUE

21.     Plaintiff Nancy L. Taylor is an individual who is a citizen and resident of West Palm Beach, Florida. At the time she purchased the Neptune Society's Standard Neptune Plan and Transportation and Relocation Protection Plan from Defendants, Ms. Taylor was 69 years old.

22.     Defendant Service Corporation International is a Texas corporation with its principal executive offices at 1929 Allen Parkway, Houston, Texas, 77019. During the times mentioned herein, Service Corp. conducted business throughout the State of Florida, including within Broward County, either directly or through control of one of its subsidiaries or alter egos.

23.     Defendant SCI Direct, Inc. is a Florida corporation with its principal executive offices at 1929 Allen Parkway, Houston, Texas, 77019 and its principal place of business in Florida at 1250 S. Pine Island Road, Suite 500, Plantation, Florida, 33324. SCI Direct, Inc. was formerly known as The Neptune Society, Inc., but changed its name with the Florida Division of Corporations to SCI Direct, Inc. effective December 17, 2013.  During the times mentioned herein, SCI Direct, Inc. conducted business throughout the State of Florida, including within Broward County, either directly or through control of one of its subsidiaries or alter egos. SCI Direct, Inc. is 100% owned by Service Corporation International, and is now, and at all times relevant to this action was, a subsidiary of Service Corporation International.

24.     Defendant Neptune Society Management Corporation is a California corporation with its principal address at 1929 Allen Parkway, Houston, Texas, 77019. During the times mentioned herein, Neptune Society Management Corporation conducted business throughout the

State of Florida, either directly or through control of one of its subsidiaries or alter egos. Neptune Society Management Corporation is now, and at all times relevant to this action was, a subsidiary of Service Corporation International. The registered fictitious business name of Neptune Society Management Corporation is "Neptune Society."

25.     Defendants John Does 1-20 are Service Corp. subsidiaries or affiliates offering prepaid cremation services and merchandise within the State of Florida.

26.     Defendants advertise to consumers in Florida and attract Florida customers in part through the website www.neptunesociety.com. According to Defendants, the website neptunesociety.com is offered by SCI Direct, Inc. and all its parents and affiliates, which includes Service Corp. Through this website, potential customers can request more information, RSVP for a seminar and free lunch at a nearby restaurant, or enroll and pay online for preplanned cremation services.

27.     Service Corp. also operates a website through which it advertises and recruits potential employees of Service Corp. and its affiliate-Defendants, www.jobs.sci-corp.com. This website is interactive, allowing the job applicant to submit a resume and other personal information and to apply for specific positions, including positions with Neptune Society in Florida and including positions involving the direct solicitation of Florida consumers for the purchase of cremation services and merchandise. According to the website, this website is offered by Dignity Memorial Network, Inc. and all its parents and affiliates, which includes  Service Corp. Dignity Memorial Network is a wholly owned subsidiary of Service Corp.

28.     Service Corp. also directly hires employees based in Florida to oversee the operation of its Florida subsidiaries and affiliates, including employees responsible for marketing preneed contracts to Florida consumers. Job postings by Service Corp. for positions based in the

State of Florida (including for jobs marketing preneed sales to customers in the State of Florida) appear on websites such as Indeed.com.

29.     On websites such as LinkedIn, numerous Florida residents identify themselves as being current or former employees of Service Corp. working (or having worked) in the State of Florida for Service Corp., including individuals with job responsibilities involving marketing or making sales of preneed services to consumers in the State of Florida.

30.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different from at least one Defendant.

31.     Defendants are subject to personal jurisdiction in the State of Florida because SCI Direct was incorporated in Florida and maintains its principal place of business in Florida, NSMC is a foreign corporation registered with the Florida Division of Corporations as authorized to transact business in Florida, and all Defendants regularly transact business in both Florida and this judicial district by, among other things, offering their services and products in Florida and this judicial district either directly or through subsidiaries, and employing individuals in the State of Florida to market and sell their services and products in the State of Florida and in this judicial district. In addition, Defendants have committed tortious acts in this judicial district or directed such actions from its subsidiaries' and/or other Defendants' corporate offices located in this judicial district.

32.     Each of the Defendants engages in a joint effort and conspiracy with each of the other named Defendants to violate the laws as alleged herein. Each of Service Corp.'s subsidiaries and affiliates named in this action engage in the same sales practices as alleged herein, utilizing

the same Neptune Society contract forms involved in the misleading, deceptive, and unfair conduct alleged in this complaint. Service Corp., and numerous of its affiliates and subsidiaries were recently sued by the State of California for engaging in the same practices involving the same misleading, deceptive, and unfair contract forms alleged herein, including entities not named as Defendants herein such as S.E. Acquisition of California, Inc., S.E. Combined Services of California, Inc., Neptune Society of Northern California, and Trident Society, Inc. That numerous other Service Corp. subsidiaries and affiliates—purported to be independent and distinct from the named Defendants—have engaged in identical sales and marketing practices using the same misleading, deceptive, and unfair contract forms as alleged herein demonstrates that Service Corp., SCI Direct, NSMC and others have undertaken a joint effort and conspiracy to adopt identical sales practices nationwide, which necessarily includes actions taken by members of the conspiracy in Florida in order to effectuate their unlawful scheme.

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are deemed to "reside" in this district as a result of their contacts within this district.

34.     Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to Plaintiff's claims occurred in this district or were directed from this district.

35.     Finally, venue is proper under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this district and have committed tortious acts in this judicial district.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

**I.      Preneed Funeral Services and the Florida Statutes Governing Them**

36.     Funeral services, including cremation services, are sold in two ways: (1) "at-need" services are funeral services sold to survivors for the funeral of a loved one who has just died; and

12

(2) "preneed" services are funeral services sold in advance for a specified beneficiary before that beneficiary's death.

37.     The consumer base for preneed services is dominated by senior citizens over the age of 60, who purchase preneed plans as part of estate and end-of-life planning. Indeed, preneed service providers such as Defendants extensively market their services to senior citizens through online and print advertising. Service Corp.'s and Neptune Society's websites for preneed services prominently feature pictures of silver-haired (apparent) senior citizens, the target consumers for preneed services.

38.     When a Florida consumer purchases preneed funeral services, the consumer typically pays for or agrees to pay for the services at the time of purchase, either by full payment up-front or through an installment contract, even though services are not provided until the intended beneficiary has died.

39.     Fla. Stat. § 497.005(61) defines a preneed contract as "any arrangement or method, of which the provider of funeral merchandise or services has actual knowledge, whereby any person agrees to furnish funeral merchandise or service in the future." These "preneed contracts" allow consumers to purchase in advance (and at current costs):

　　　　a.　burial/cremation *services*, defined under Fla. Stat. § 497.005(9) as "any service offered or provided in connection with the final disposition, memorialization, interment, entombment, or inurnment of human remains or cremated remains"; and

　　　　b.　burial/cremation *merchandise*, defined under Fla. Stat. § 497.005(7) as "any personal property offered or sold by any person for use in connection with the final disposition, memorialization, interment, entombment, or inurnment of

human remains or cremated remains, including, but not limited to, caskets, outer burial containers, alternative containers, cremation containers, cremation interment containers, urns, monuments, private mausoleums, flowers, benches, vases, acknowledgment cards, register books, memory folders, prayer cards, and clothing."

40.     Under applicable Florida statutes, there are two types of preneed trust contracts, *i.e.,* revocable and irrevocable. In the case of revocable preneed trusts, the purchaser has the right to (i) cancel the applicable contract at any time and receive a full refund of the purchase price for the preneed services (but not the merchandise or cash advance items already purchased or funds expended), or (ii) transfer the preneed services refund to a different funeral and/or cremation services provider. On the other hand, in the case of irrevocable trusts, purchasers have no right of cancellation, but retain only the right to transfer the preneed services refund to a different provider.

41.     Because consumers may purchase preneed funeral services years, or even decades, in advance of death, there is a significant risk that the services purchased will not be available when needed. A funeral services provider might go out of business in the intervening years—a risk Service Corp. itself is acutely aware of, as it petitioned the State of Florida's funeral board for permission to remove preneed funds from a trust fund during a time of financial distress in 2000.

42.     Alternatively, the needs or wishes of the beneficiary may change. The beneficiary might move out of the provider's service area and wish to establish a preneed contract with a funeral services provider in their new location, or they might wish to change the type of funeral (burial vs. cremation) for their remains and thus no longer desire the preneed services for which they paid. Other customers may simply decide that they want a different funeral home or cremation services provider to handle their cremation. Whether the applicable preneed contract is revocable

or irrevocable, Florida law provides consumers the right to change their mind, for any reason at all, and move their preneed funds from one provider to another or obtain a full refund (minus applicable processing fees) of the purchase price of preneed cremation services.

43.     In order to protect consumers in Florida from the risk of non-performance, and to provide consumers portability of prepaid services and the ability to obtain refunds should their preneed cremation plans change, Florida passed statutory protections designed to regulate the sale of preneed contracts for funeral, burial, and cremation services and merchandise. *See* Florida Statutes, Chapter 497, Part IV. Included in these provisions are requirements that the bulk of the proceeds received for a preneed contract are placed in trust, with preneed providers able to select among various specific means for compliance.

44.     Defendants placed the proceeds from preneed contracts in trust pursuant to Fla. Stat. § 497.458: "Any person who is paid, collects, or receives funds under a preneed contract for funeral services or merchandise or burial services or merchandise shall deposit an amount at least equal to the sum of 70 percent of the purchase price collected for all services sold and facilities rented; 100 percent of the purchase price collected for all cash advance items sold; and 30 percent of the purchase price collected or 110 percent of the wholesale cost, whichever is greater, for each item of merchandise sold."[5]

45.     The Florida statute also sets refund terms for preneed contracts, understanding that the ability for consumers to obtain refunds on preneed contracts should their life circumstances change was important to protect consumers. Under Fla. Stat. § 497.459(1), a purchaser "may cancel a preneed contract within 30 days of the date that the contract was executed provided that

---

[5] Neptune Society's Standard Neptune Plan states that "Seller shall deposit into trust an amount at least equal to the sums of 70% of the purchase price collected for all services sold and facilities rented."

the burial rights, merchandise, and services have not been used" and is "entitled to a complete refund of the amount paid, except for the amount allocable to any burial rights, merchandise or services that have been used."

46.     With respect to refunds sought after 30 days, the Florida statute differentiates between services and merchandise, again allowing a full refund for services, but limiting merchandise refunds to those items which the preneed provider cannot, or does not, deliver. *Compare* Fla. Stat. § 497.459(2)(a) (entitles any purchaser of a preneed contract to "cancel the services, facilities, and cash advance items portions of a preneed contract at any time, and…be entitled to a full refund of the purchase price allocable to such items), *with* Fla. Stat. § 497.459(2)(b) (purchaser can "cancel the *merchandise* portion of a preneed contract" but is only "entitled to a full refund of the purchase price allocable to the specific item or items of merchandise that the preneed licensee *cannot or does not deliver*" (emphasis added)).

47.     Also included in these statutes are provisions prohibiting any advertising that is deceptive, misleading, omits relevant information, or has a capacity or tendency to mislead, deceive, or create false or unjustified expectations. The statute also requires funeral providers to disclose the amount that will be trusted for each contract and to disclose what refund the consumer will be entitled to if they cancel any contracts covered by the statute, understanding that consumers would consider such information material to their purchase decision.

48.     In short, a Florida consumer who purchases a preneed cremation contract from SCI, but decides 31 days later that they want to be buried instead or will be moving out of the service area of SCI, can cancel the contract and receive a full refund of the amounts paid for cremation services—but they will not be entitled to a refund for the urn or other merchandise purchased so long as SCI delivers that merchandise at, or before, the time of cancellation.

## II.     Defendants' Bait-and-Switch

49.     Aware of the above differences in Florida law, Defendants engage in a series of deceptive and unfair practices to induce customers to purchase a plan that arbitrarily maximizes the upfront cash received by Defendants while minimizing the amounts placed in trust and available for refund should customers decide to cancel.

50.     First, Neptune Society prices a Direct Cremation, Standard Plan as somewhere in the range of $2,000-$2,300. This includes everything that is necessary for a cremation but without any merchandise. Were a customer to purchase this plan alone, 70% of the money would be placed into trust, and the customer would be entitled to a 100% refund at any time.

51.     Next, Neptune Society provides a la carte prices for merchandise that are incredibly high: $498.00 for a memory chest, $329.00 for an urn, $199.00 for a keepsake plaque, and, remarkably, $185.00 for a "planning guide."[6] The wholesale cost of these items is equal to, or less than, approximately $25, and the fair market retail value not much higher. If Neptune Society choses to deliver these items to the customer upon or before cancellation, the customer is entitled to no refund for the merchandise. Few, if any, customers, purchase merchandise from Neptune Society a la carte.

52.     Instead, almost all customers purchase the "Standard Neptune Plan" with Neptune Society, consisting of direct cremation services and all the merchandise listed above, for either the same price as, or a slightly higher ($100-$200) price than, the direct cremation services alone. By including vastly inflated figures in its price list for merchandise, Neptune Society steers consumers towards the Neptune Society's "Standard Neptune Plan," which provides this over-priced merchandise in combination with all of the ordinary and standard cremation services at what

---

[6] On information and belief, the planning guide is a PDF file that Defendants email to customers or print for customers, and thus has *de minimis* marginal cost to reproduce.

appears to be a bargain discount and, following negotiation, either the same price or only slightly more than the direct cremation services alone.

53.     As a result of these sales tactics, virtually all customers purchase the "Standard Neptune Plan" with Neptune Society. While Plaintiff does not yet have the figures for Florida, a recently filed complaint by the California Attorney General against Defendants reveals that in California, a state in which Defendants have operations similar in scope to Florida and in which Defendants engage in the same sales tactics, 99% of Defendants' customers chose the "Standard Neptune Plan." The numbers are likely substantially similar in Florida.

54.     Throughout this time period, the Standard Neptune Plan and its price were placed prominently on the first page of Neptune Society's General Price List. The subsequent pages of the General Price List set forth itemized selections that customers can purchase a la carte under two categories: (1) "Services (Sold on a preneed basis)" and (2) "Merchandise." Each itemized selection has a listed price if purchased separately. These itemized pages of the General Price List also indicate (with an asterisk) the services and merchandise included in the Standard Neptune Plan. According to the General Price List, "[i]f purchased separately, total cost of these items [in the Standard Neptune Plan] is $3,607.00-$3,757.00."[7]

55.     Only at the time of contract signing does Neptune Society reveal to the customer that the "Standard Neptune Plan"—marketed by Defendants as a single package and a single transaction—will actually consist of two contracts with Neptune Society that are tied so they cannot be executed individually: (1) a "Preneed Funeral Agreement" contract covering the cremation services that is substantially discounted from the price listed on the price sheet; and (2)

---

[7] Note that this appears to be an error, as adding up the total costs using the higher $579 amount for "Transportation within our Service Area" would equal to $3,857.00, and not the $3,757.00 indicated.

a "Retail Merchandise Agreement" contract in which the customer will pay the full, vastly-inflated, list prices for the merchandise.

56.     Neptune Society makes it impossible to execute only one half of these two contracts—to obtain the Standard Neptune Plan you must execute both. Indeed, Neptune Society affirmatively ties the two contracts together so that you cannot cancel the merchandise contract and keep the services agreement within the 30-day merchandise cancellation window. Neptune Society's Retail Merchandise Agreement requires that any cancellation of the ostensibly separate Retail Merchandise Agreement within 30 days also cancels the Preneed Funeral Agreement for cremation services.

57.     Defendants' sales and marketing practices create the impression that customers lose nothing and gain valuable merchandise by purchasing the Neptune Society's Standard Neptune Plan in lieu of Neptune Society's Direct Cremation Standard Plan. However, the reality is markedly different. By splitting the plan into two tied contracts with Neptune Society that are not available individually, and then heavily discounting the cremation services and vastly overcharging for the merchandise via those contracts with Neptune Society, Defendants harm the customer by placing only a fraction of the value of the cremation services into trust.

58.     This practice not only reduces the protection afforded against Defendants' default, it also reduces the portability of the preneed contract because it results in a substantially lower refund should the customer cancel after 30 days. As the chart below illustrates, a customer purchasing the Standard Neptune Plan with Neptune Society would have only $783.30 placed in trust against Neptune Society's future default and would have only $1,119.00 available for refund after 30 days. In contrast, a customer purchasing the identical set of cremation and shipping services (minus the merchandise) through a combination of the Direct Cremation Standard Plan

plus Packaging and Shipping of Cremated Remains would have $1,488.90 placed in trust and their full purchase price of $2,127.00 available for refund if they should move or choose to change providers.

59.     The following chart shows the prices, amounts paid in trust, and amounts subject to refund under: (1) the Standard Neptune Plan; (2) the Direct Cremation Standard Plan Plus Packaging and Shipping of Cremated Remains (which amounts to the same set of cremation services provided under the Standard Neptune Plan); and (3) the Price List prices for the same services and merchandise purchased a la carte.

| Services | Standard Neptune Plan | Direct Cremation, Standard Plan (Plus Packaging/Shipping Cremated Remains) ($) | General Price List A La Carte ($) |
|---|---|---|---|
| Basic Services of Funeral Director and Staff | Included | Included | 950.00 |
| Transportation within Service Area | Included | Included | 329.00 |
| Climate Controlled Holding Facility | Included | Included | 339.00 |
| Cremation/Crematory Fee | Included | Included | 359.00 |
| Alternative Container (Cardboard Receptacle) | Included | Included | 95.00 |
| **Non-Shipping Services Sub-Total** | | **1,977.00** | **2,072.00** |
| Packaging and Shipping Cremated Remains | Included | 150.00 | 150.00 |
| **All Services (incl. Shipping) Sub-Total** | | **2,127.00** | **2,222.00** |
| High Gloss Memento Chest | Included | | 498.00 |
| Urn (Brown Burl Finish or Biodegradable) | Included | | 329.00 |
| Forever Love Candle Plaque Keepsake | Included | | 199.00 |
| Thank You Cards (25) | Included | | 25.00 |
| A Planning Guide | Included | | 185.00 |
| Making Everlasting Memories (online memorial) | Included | | 149.00 |
| **Merchandise Sub-Total** | | | **1,385.00** |
| **Total Price of Plan[8]** | **2,504.00** | **2,127.00** | **3,607.00** |
| **Amounts Placed in Trust** (70% of Services, 30% of Non-Delivered Merchandise)[9] | **783.30** | **1,488.90** | **1,555.40** |
| **Amounts Refundable After 30 days** (100% of Services, 0% Delivered Merchandise) | **1,119.00** | **2,127.00** | **2,222.00** |

60.     This structure benefits and unjustly enriches Defendants because they place only

$783.30 into the trust for the entire package of services and merchandise. In contrast, if the same

---

[8] Plan refers to: (1) the Standard Neptune Plan vs. (2) the Direct Cremation Standard Plan plus Packaging and Shipping of Cremated Remains (but no merchandise) vs. (3) purchasing all services/merchandise included in the Standard Neptune Plan a la carte based on General Price List prices.

[9] Because Defendants deliver the merchandise to the consumer within 30 days of purchasing the Standard Neptune Plan, Defendants are not required under statute to hold any amount from merchandise in trust, as the 30% requirement only applies to non-delivered merchandise.

services are purchased under the Direct Cremation Standard Plan plus a la carte Packaging and Shipping of Remains, $1,488.90 are placed into trust.

61.     Defendants' advertising on their respective websites and elsewhere is deceptive, misleading, has the capacity or tendency to deceive or mislead, creates false or unjustified expectations, and omits relevant facts required not to make it materially misleading because Defendants advertise that a consumer's money will be placed into trust, that a consumer who purchases the Standard Neptune Plan is purchasing a single integrated plan for one price, and that the Standard Neptune Plan is better or equivalent to purchasing or negotiating the price of the Direct Cremation Plan with no meaningful drawbacks.

62.     When comparing the Direct Cremation Plan and the Standard Neptune Plan, a consumer would want to know how the two plans differ on the terms of cancellation (including specifically the amount eligible for a refund in the event of cancellation) and the amounts placed in trust. A close examination reveals that the two plans contain substantively distinct trust protections and provide widely disparate cancellation refunds.

63.     Consumers are injured because only a fraction of the true cost of cremation services is placed into trust and made available to them if Defendants should go bankrupt or default on the provision of services. Moreover, with respect to refunds after 30 days, purchasers of the Standard Neptune Plan will receive only $1,119.00 on their outlay of $2,504.00, while purchasers of the Direct Cremation Standard Plan plus a la carte Packaging and Shipping of Remains will receive 100% of the $2,127.00 they paid.

64.     To put this another way, Defendants received $1,385.00 for the "merchandise" sold under its bait-and-switch – merchandise that had a *de minimis* wholesale cost to Defendants and a value that was incidental at best to the consumer (as the merchandise was merely an add-on to the

actual cremation services being purchased). This amount was not refundable even if the customer cancelled the preneed contract because the merchandise was delivered by Defendants within weeks of signing.

65.     Thus, because of Neptune Society's wrongful, deceptive, and unfair method of apportioning the Standard Neptune Plan discount, customers who purchased the Standard Neptune Plan paid approximately $1,200.00 for merchandise they would not have otherwise purchased.

66.     Notably missing from the General Price List or Neptune Society's description of the Standard Neptune Plan is any statement that Defendants will place far fewer funds ($783.30 versus $1,488.90) into a preneed, fully refundable trust under the Standard Neptune Plan as they would if the same services were purchased under the Direct Cremation Standard Plan plus Shipping. Nor is there any indication that the refund amount available under the Standard Neptune Plan ($1,119.00) is barely more than half that available under the Direct Cremation Standard Plan plus shipping ($2,127.00). These are material terms of the agreements, and consumers need this information in order to evaluate and compare the transactions being offered, as Neptune Society's own advertisements compare them side-by-side.

67.     Rather, consumers are led to believe, by Neptune Society's General Price List as well as Defendants' sale practices and marketing, that other than the purported savings they obtain through the purchase of the Standard Neptune Plan, there is no difference between the Standard Neptune Plan and purchasing the stand-alone direct cremation services and merchandise a la carte via the General Price List.

68.     Indeed, Neptune Society's brochure for the Standard Neptune Plan, provided to consumers in Florida should they inquire about preneed cremation services through websites operated by Defendants, creates the opposite impression, stating that "Your pre-paid plan is

protected" as "Your monies are placed into a state-required trust fund, held and invested for future need, in accordance with state law." The same brochure notes that Neptune Society will provide a "Review of all state-regulated protections guaranteed to you."

69.     And yet Defendants never disclose that consumers purchasing the Standard Neptune Plan do not receive the same trust treatment and amounts recoverable as a refund in the event of cancellation of the preneed contract as they would have if they had purchased the services and merchandise a la carte, or if they had purchased just the direct cremation packages and obtained any desired merchandise from someone else, or at a later time point closer in time to when it is needed.

70.     Neptune Society's deceptions do not stop there, for they further inform the customer in the Preneed Funeral Agreement that "You shall have 30 days from the execution of this agreement to cancel the agreement" and receive a full refund. That is not true, or is materially misleading, because Fla. Stat. § 497.459 provides that "A purchaser, by providing written notice to the preneed licensee, may cancel the services, facilities, and cash advance items portions of a preneed contract **at any time**, and shall be entitled to a full refund of the purchase price allocable to such items." (emphasis added).

71.     Neptune Society's two tied contracts also do not contain the required disclosure of how much each consumer will be entitled to as a refund if they cancel their contract after 30 days. Had they done so, the consumer would have been informed that cancelling the contract after 30 days would result in only a refund for the heavily discounted cremation services and not the massively up-charged merchandise agreement, and a substantially lower refund than had the consumer simply purchased the direct cremation package by itself.

72.     And Neptune Society does not permit a customer to cancel just the Retail Merchandise Agreement within 30 days (and receive a full refund on the listed price of that merchandise), because its ostensibly separate Retail Merchandise Agreement contract mandates that should a customer return the merchandise within 30 days for a full refund, the "return pursuant to this section is the cancellation of this [Retail Merchandise] Agreement *and also operates as Purchaser's written request to cancel their Preneed Funeral Agreement*, unless the Preneed Funeral Agreement has been made irrevocable." (emphasis added.)

73.     Upon information and belief, Defendants also do not remit sales tax to the State of Florida for the merchandise purchased in the Retail Merchandise Agreement. The Retail Merchandise Agreement contains a line for sales tax, but on Plaintiff's contract (and on contracts of other members of the class) this line was left blank. Additionally, NSMC (which currently operates Neptune Society as a registered fictitious business name) is not registered with the State of Florida as a payer of sales tax. This is either: (a) an admission by Defendants as they filled out the Neptune Society contract forms that the provision of merchandise as part of the Standard Neptune Plan was really a service offered in connection with the cremation services; (b) an admission that the merchandise's actual retail value was zero; and/or (c) a representation to the consumer that no sales tax was collected on the Standard Neptune Plan, thereby creating the deceptive or misleading impression or unjustified expectation that the purchase of the Standard Neptune Plan was one agreement for the provision of services and no different or worse for the consumer than purchasing the direct cremation plan.

74.     On information and belief, Defendants repeated this bait-and-switch conduct across thousands (if not tens or hundreds of thousands) of Standard Neptune Plan contracts with Neptune Society sold in the State of Florida during the Class Period.

25

75.     Defendants' bait-and-switch and deceptive accounting related to the Standard Neptune Plan is a violation of FDUTPA and the Florida Funeral, Cemetery, and Consumer Services Act.

### III.     Defendants' Bait-and-Switch Scheme With the Standard Neptune Plan was Knowingly and Willfully Targeted at Senior Citizens

76.     As mentioned above, the primary consumers of preneed contracts in the State of Florida, including the Neptune Society's Standard Neptune Plan marketed and sold by Defendants, are senior citizens over the age of 60.

77.     Defendants actively and aggressively market the Standard Neptune Plan to senior citizens on their respective websites on the internet and in other advertising.

78.     When consumers purchase a Standard Neptune Plan with Neptune Society sold or advertised by Defendants, they are required to provide the beneficiary's date of birth when filling out the Preneed Funeral Agreement/Neptune Preneed Direct Cremation Package.

79.     Defendants therefore know, at the time of sale, whether the beneficiary of the Standard Neptune Plan that is being purchased is over the age of 60.

80.     Despite this knowledge, Defendants continue to employ their bait-and-switch tactic in regards to the Standard Neptune Plan to the detriment of Floridian senior citizens.

81.     As such, Defendants' violation of FDUTPA includes a violation of Fla. Stat. 501.2077, which states that a "person who is willfully using, or has willfully used, a method, act, or practice in violation of [FDUTPA] which victimizes or attempts to victimize a senior citizen or a person who has a disability is liable for a civil penalty of not more than $15,000 for each such violation if she or he knew or should have known that her or his conduct was unfair or deceptive."

82.     On information and belief, Defendants repeated this bait-and-switch conduct across thousands (if not tens of thousands) of Standard Neptune Plan contracts sold to senior citizens in the State of Florida during the Class Period.

## IV.     Defendants Collect An Undisclosed Financial Interest for Sales of the Transportation and Relocation Protection Plan While Paying MASA a Set Fee Regardless of How Much SCI Charges Consumers.

83.     Defendants' bait-and-switch regarding apportionment of the Standard Neptune Plan discount is not the only way by which Defendants harm consumers in violation of FDUTPA in relation to preneed cremation services.

84.     Along with the Standard Neptune Plan, Neptune Society also offers an additional "Transportation and Relocation Protection Plan" that "protects the Beneficiary of the Preneed Funeral Agreement from incurring additional out-of-pocket expenses if death occurs while Beneficiary is traveling anywhere in the world or if Beneficiary relocates within the contiguous United States."

85.     The Transportation and Relocation Protection Plan appears on the first page of Neptune Society's General Price List, directly under the Standard Neptune Plan, and is advertised there as being "only offered at the time of prearrangement."

86.     The Transportation and Relocation Protection Plan was available for $549.00 according to Neptune Society's General Price List effective as of June 1, 2019.

87.     In the event a beneficiary travels outside of the 75-mile radius of the beneficiary's home and dies, the Transportation and Relocation Protection Plan protects the beneficiary from the costs involved in returning the beneficiary's body or remains to the local service provider for further cremation services (and/or in arranging to provide those same services at the location where the beneficiary is traveling before transporting the remains back to the local service provider).

88.     Neptune Society forces every customer who purchases a Neptune Society Standard Neptune Plan to elect to either purchase or decline to purchase the Transportation and Relocation Protection Plan – a box on the Transportation and Relocation Protection Plan contract is included for the preneed customer to decline the plan by writing their initials, which states: "I hereby decline the above mentioned Plan. In the event that death of Beneficiary occurs outside of Neptune [Society]'s Service Area, I understand that there will be additional charges. **Furthermore, I understand that I will not have the opportunity to purchase this Plan at a later date.**" (emphasis in original.) This representation is false, as in actuality, a customer could purchase this or an identical plan at a later date.

89.     This Neptune Society contract language and the marketing of the Transportation and Relocation Protection Plan by Defendants is intended to create the net impression that the Transportation and Relocation Protection Plan is in the preneed customer's best interest and that there is some requirement that the customer must decide now whether or not to purchase the plan.

90.     And because Defendants sell the Transportation and Relocation Protection Plan along with and at the same time that they sell the Standard Neptune Plan, they are aware whether the beneficiary of the plan being purchased is a senior citizen over the age of 60, as purchase of the Standard Neptune Plan requires the purchaser to indicate the beneficiary's date of birth.

91.     According to the Transportation and Relocation Protection Plan, Neptune Society "is a third party seller for MASA"—or Medical Air Services Association of Florida, Inc. By telling the customer it is a "third-party," Neptune Society informs the customer and/or creates the impression that Neptune Society has no financial interest in the plan.

92.     Indeed, the contract language for the plan requires the purchaser, when signing, to "acknowledge that [the Transportation and Relocation Protection Plan] is being sold separately on

behalf of MASA on its own independent contract. Coverage begins at the time of contracting and it is not considered part of any other contract nor is it a trust funded preneed funeral service or good."

93.     Furthermore, the contract language for the plan states that if the consumer cancels their preneed funeral agreement with Neptune Society, the Transportation and Relocation Protection Plan is "portable through MASA to any new preneed funeral service provider."

94.     At no point in its marketing or in the contract language of the Transportation and Relocation Protection Plan do Defendants indicate that they have a significant financial interest in the sale of the plan.

95.     Indeed, the contract language above creates and is intended to create the false net impression in the consumer that the price of the Transportation and Relocation Protection Plan is a pass-through fee, *i.e.*, a fee that is passed on in its entirety to another entity (in this case MASA) and for which Defendants have no purported financial interest.

96.     The net impression of Neptune Society's representations and omissions to consumers is that, when consumers purchase the Transportation and Relocation Protection Plan, the funds to cover the plan's cost go to MASA. In other words, Neptune Society's representations and omissions to its customers during the purchase process—including the language in the contract of the Transportation and Relocation Protection Plan itself—convey the misleading impression that the cost of the plan is a pass-through fee, where Defendants merely collect the money for the plan from the consumer and forwards it on to the actual provider MASA, without any profit interest in the fee.

97.     However, when Defendants collect the money for the Transportation and Relocation Protection Plan from the customer, they retain an undisclosed financial interest of

between 50-65% of the total cost for every Transportation and Relocation Protection Plan sold on behalf of MASA in violation of FDUTPA.

98.     This undisclosed financial interest varies because regardless of the price charged to the customer and collected by Neptune Society, Defendants only transmit a set fee (believed to be less than $165) to MASA for each plan sold. Thus, if Defendants charge and collect from a customer a higher price (such as the $549 on Neptune Society's price list), Defendants receive a larger profit as a percentage because the ultimate real cost of the Transportation and Relocation Protection Plan remitted to MASA is fixed.

99.     As the price of the Transportation and Relocation Protection Plan charged to the customer includes this undisclosed financial interest collected by Defendants before paying out the fixed set fee to MASA, consumers (including Plaintiff and members of the Transportation and Relocation Protection Plan Purchaser Class) who bought the Transportation and Relocation Protection Plan were overcharged and/or were induced to purchase the plan because it was being solicited as advantageous by a party that was purportedly financially uninterested and unbiased in its sale. Plaintiff and the class members are entitled to a full return of the undisclosed financial interest that they unknowingly paid and/or the right to rescind the purchase in its entirety.

100.     Defendants have never disclosed to Plaintiff, or any of the class members, the true nature of their relationship with MASA, and specifically have not disclosed the fact that they retain a substantial portion of the Transportation and Relocation Protection Plans they sell. Whether an ostensibly independent third-party has an undisclosed financial interest in a product it is soliciting a consumer to purchase from another entity is a material fact.

101.     These activities have harmed Plaintiff and the proposed class of consumers while benefiting Defendants. On information and belief, Defendants retained millions of dollars in

undisclosed financial interests as part of their sale of the Transportation and Relocation Protection Plans to thousands (if not tens or hundreds of thousands) of Florida consumers.

**V.    Plaintiff Was Harmed By Defendants When She Purchased a Standard Neptune Plan and Transportation and Relocation Protection Plan.**

102.    Plaintiff Nancy Taylor purchased a Standard Neptune Plan and Transportation and Relocation Protection Plan from Neptune Society on approximately August 15, 2017.

103.    The plans were sold to Plaintiff by Defendants' agent, and the contracts for the plans were signed in person by Plaintiff in front of Defendants' agent in Plaintiff's home, after Plaintiff submitted a request through Neptune Society's website. The identity of Defendants' agent involved in selling Plaintiff's plans is known to Defendants, but is believed to be Scott Smiley.

104.    At the time of purchase of the Standard Neptune Plan and Transportation and Relocation Protection Plan, Plaintiff was 69 years old. Plaintiff disclosed this fact to Defendants by providing her date of birth (May 6, 1948) on Neptune Society's contract when buying the plans.

105.    At the time of Plaintiff's purchase, Neptune Society's General Price list advertised the Standard Neptune Plan with a price of $2,344.00, and the Transportation and Relocation Protection Plan with a price of $499.00, for a total cost of $2,843.00.

106.    Because Plaintiff paid in full at the time of purchase and purchased both the Standard Neptune Plan and the Transportation and Relocation Protection Plan, she was able to negotiate additional adjustments and discounts from Defendants, and thus paid a total of $2,643.00, broken down as follows: $1,030.05 for services, $1,149.05 for merchandise, and $463.90 for the Transportation and Relocation Protection Plan.

107.    Plaintiff executed the Standard Neptune Plan via two separate but tied contracts with Neptune Society: a Preneed Funeral Agreement for services and a Retail Merchandise Agreement for merchandise.

108.    Plaintiff's Retail Merchandise Agreement with Neptune Society, which was filled out by Defendants' agent at the time of sale and Plaintiff's signing of the contract, left blank a line for "Sales Tax."

109.    Plaintiff's Retail Merchandise Agreement with Neptune Society also included the provision mandating that if Plaintiff returned her merchandise within 30 days for a full refund (as required by law), it would operate as her written request to cancel the Preneed Funeral Agreement for services.

110.    Plaintiff's Preneed Funeral Agreement with Neptune Society failed to include on its signature page in boldfaced typeface 10-point type or larger, as required under Florida Stat. 497.468(7), the specific amount to be trusted and the amounts to be refunded upon contract cancellation if cancelled after 30 days.

111.    Instead, the signature page of Plaintiff's Preneed Funeral Agreement did not disclose what amount of the Preneed Funeral Agreement would be held in trust, and said only that Plaintiff "shall have 30 days from the execution of this Agreement to cancel this Agreement. Refund upon cancellation is 100% of the purchase price allocable to services, if the services have not yet been provided." This created the false net impression that Plaintiff could only receive a refund of the Preneed Funeral Agreement purchase price if she cancelled within 30 days.

112.    Thus, via Defendants' sales and marketing practices and contractual bait-and-switch, Defendants were able to induce Plaintiff to purchase the "Standard Neptune Plan" with Neptune Society and then have her sign two ostensibly separate but in fact tied contracts with Neptune Society that vastly inflated the value of the merchandise she was provided, vastly decreased the amount of money that was put into trust on her behalf, and vastly reduced the amount of money to which she would be entitled in the event she cancelled the contract (while also telling

her that she had to cancel within 30 days even though Florida law permits her to cancel at any time).

113.    Plaintiff also purchased a Transportation and Relocation Protection Plan from Neptune Society (as third-party seller for MASA) on approximately August 15, 2017, and paid $463.90 for that policy.

114.    Upon information and belief, between 50-65% of that $463.90 price constituted an undisclosed financial interest that Defendants retained prior to paying MASA its set, fixed price for each plan.

115.    After paying for her Standard Neptune Plan and Transportation and Relocation Protection Plan, Plaintiff received a letter dated September 2, 2017, from Neptune Society's Dolores Ramos, SVP of Operations, notifying her that her account had been paid in full. According to records filed with the Florida Division of Corporations, Dolores Ramos is registered as a Vice President with SCI Direct, Inc.

116.    After paying for her Standard Neptune Plan and Transportation and Relocation Protection Plan, Plaintiff received a letter dated September 2, 2017, from Neptune Society's Tim Nicholson, President & CEO, confirming her plan acceptance. According to records filed with the Florida Division of Corporations, Tim Nicholson is registered as President and Director of SCI Direct, Inc., and President, Secretary, and Director of Neptune Society Management Corporation.

## CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23.

### Class Definition

118.    Plaintiff seeks to represent the following classes:

<u>Standard Neptune Plan Purchasers Class</u>
All persons who (a) within four (4) years of the present purchased a Standard Neptune Plan from Defendants within the State of Florida or (b) made a payment on a Standard Neptune Plan purchased from Defendants within the State of Florida within two (2) years of the present (the "Class Period"), excluding all Standard Neptune Plans for which Defendants have performed the contracted for cremation services.

<u>Transportation and Relocation Protection Plan Purchasers Class</u>
All persons who purchased a Transportation and Relocation Protection Plan from Defendants within the State of Florida within four (4) years of the present or made a payment on a Transportation and Relocation Protection Plan purchased from Defendants within the State of Florida within (2) years of the present (the "Class Period").

Excluded from these classes are Defendants, its affiliates, subsidiaries, agents, board members, directors, officers, and employees. Also excluded from the class are the district judge and magistrate judge assigned to this case, their staff, and their immediate family members.

119.    This class action is brought pursuant to Rule 23(b)(1)(A) because inconsistent or varying adjudications with respect to individual class members could establish incompatible standards of conduct for Defendants.

120.    This class action is also brought pursuant to Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to all the members of the class, thereby making final injunctive relief or declaratory relief concerning the class appropriate.

121.    This class action is also brought pursuant to Rule 23(b)(3) because the questions of law or fact common to Plaintiff's claim and the class members' claims predominate over any question of law or fact affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

122.    Defendants have subjected Plaintiff and the members of the classes to the same unfair, unlawful, and deceptive practices and harmed them in the same manner. The conduct described above is Defendants' standard business practice.

123.    All of the members of the class, by transacting with Defendants, were subject to the same choice of law provisions within the Standard Neptune Plan and/or Transportation and Relocation Protection Plan dictating that any disputes over transactions between customers and Neptune Society related to those agreements were to be "governed by the laws of the State of Florida." All of the members of the class also transacted with Defendants within the State of Florida as Florida consumers.

A.    **Numerosity**

124.    The individual class members are so numerous that joinder of all members in a single action is impracticable. Defendants have sold thousands of Standard Neptune Plans and/or Transportation and Relocation Protection Plans to Florida consumers during the Class Period.

125.    While Plaintiff estimates the proposed class members are in the thousands, the exact number of class members, as well as the class members' names and addresses, can be identified from Defendants' business records.

B.    **Commonality/Predominance**

126.    Common questions of law and fact exist as to Plaintiff's and the class members' claims. These common questions predominate over any questions solely affecting individual class members, including, but not limited to, the following:

a.    Whether Defendants engaged in a deceptive and unfair business practice by misleading the Standard Neptune Plan Purchasers Class about the Standard Neptune Plan being one discounted agreement, only to then execute it via two separate contracts with Neptune Society where the discount was nearly entirely apportioned to the services portion of the agreement, resulting in a lower (potential or actual) refundable amount for the customer and less funds placed in trust by Defendants for the preneed cremation services;

b.      Whether Defendants willfully used the deceptive and unfair business practices alleged in regards to the Standard Neptune Plan with knowledge that Plaintiff and members of the Standard Neptune Plan Purchasers Class were over the age of 60;

c.      Whether Defendants have an undisclosed financial interest in the sale of the Transportation and Relocation Protection Plan prior to remitting to MASA a set, fixed cost;

d.      Whether the representations and omissions made about the Transportation and Relocation Protection Plan costs collected by Defendants would lead the reasonable customer to believe it was a pass-through fee that Defendants were paying to MASA;

e.      Whether Defendants willfully used the deceptive and unfair business practices alleged in regards to the Transportation and Protection Plan with knowledge that Plaintiff and members of the Transportation and Protection Plan were over the age of 60;

f.      Whether and to what extent Defendants' conduct has caused injury to the Plaintiff and the members of the classes;

g.      Whether Defendants unlawfully enriched itself at the expense of the classes;

h.      Whether Defendants engaged in a civil conspiracy to commit the wrongful actions alleged herein; and

i.      Whether the amounts to which a customer would be entitled to receive as a refund and the amounts that would be trusted are material facts to consumers considering purchasing the Standard Neptune Plan or comparing the Standard Neptune Plan's benefits to the direct cremation plan or to Defendants' a la carte services and merchandise.

C.      **Typicality**

127.    Plaintiff's claims are typical of the putative classes' members' claims because of the similarity, uniformity, and common purpose of Defendants' unlawful conduct. Plaintiff, like

all Standard Neptune Plan Purchaser class members, was damaged through Defendants apportioning her payment of money for a preneed cremation contract in a manner that reduced both the portion of the payment that was held in trust and the portion that would be refundable. Likewise, Plaintiff, like all Transportation and Relocation Protection Plan Purchaser class members, was damaged through her payment of money to Defendants that Defendants deceptively presented as a pass-through fee to MASA, when in fact Defendants enriched themselves in this process by collecting an undisclosed financial interest above the set, fixed price for the plan that Defendants remitted to MASA.

128.    Each member of Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful and deceptive conduct.

**D.    Adequacy**

129.    Plaintiff will fairly and adequately protect and represent the interest of each member of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class because she has suffered the same wrongs as the respective class members.

130.    Plaintiff is fully cognizant of her responsibilities as class representative and has retained Korein Tillery LLC and León Cosgrove LLP to prosecute this case. Korein Tillery and León Cosgrove are experienced in complex class action litigation, including litigation related to unfair and deceptive trade practices, and have the financial and legal resources to meet the costs of and understand the legal issues associated with this type of litigation.

131.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein because such treatment will permit a large number

of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

**E.      The Prerequisites of Rule 23(b)(1)(A) Are Satisfied.**

132.    The prerequisites to maintaining a class action pursuant to Federal Rule of Civil Procedure 23(b)(1)(A) is satisfied because prosecuting separate actions by individual class members against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that could establish incompatible standards of conduct for Defendants as the parties opposing the class.

**F.      The Prerequisites of Rule 23(b)(2) Are Satisfied.**

133.    The prerequisites to maintaining a class action for injunctive and equitable relief pursuant to Federal Rule of Civil Procedure 23(b)(2) exist as Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive and equitable relief with respect to the classes as a whole.

134.    Defendants' actions are generally applicable to the classes as a whole, and Plaintiff seeks, among other things, equitable remedies with respect to the classes as a whole.

**F.      The Prerequisites of Rule 23(b)(3) Are Satisfied.**

135.    The questions of law and fact enumerated above predominate over questions affecting only individual members of the classes, and class actions are the superior method for fair and efficient adjudication of the controversy.

136.    The likelihood that individual members of the classes will prosecute separate actions, and their interest in so doing, is small due to the extensive time and considerable expense

necessary to conduct such litigation relative to the amounts at stake for each individual class member.

137.    This action will be prosecuted in a fashion to ensure the Court's able management of this case as class actions on behalf of the classes. Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as class actions.

<u>**COUNT I**</u>
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")**

138.    Plaintiff incorporates paragraphs 1-137 above as if fully set forth herein and further alleges the following.

139.    This count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

140.    At all times material hereto, Plaintiff and all members of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class were consumers within the meaning of Fla. Stat. § 501.203, and are entitled to relief under FDUTPA in accordance with Fla. Stat. § 501.211.

141.    At all times material hereto, Defendants conducted trade and commerce within the meaning of Fla. Stat. § 501.203.

142.    Defendants have engaged in unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices alleged above.

143.    The misrepresentations, deceptions, and concealment and omissions of material facts alleged in the preceding paragraphs occurred in connection with Defendants' trade and commerce in Florida.

144. Defendants' unfair and deceptive acts and practices violate FDUTPA, Fla. Stat. §§ 501.201 and 501.211.

145. The Neptune Society contracts that Defendants required Plaintiff and each member of the Standard Neptune Plan Purchaser class to execute as part of their purchase of the Standard Neptune Plan are void as against public policy, insofar as they conflict with and frustrate the purposes of Florida statutes, specifically Fla. Stat. §§ 497.450-497.468, which govern the sale of preneed cremation contracts, the trust treatment of funds received for preneed cremation contracts, and the refunds of such funds in the event of cancellation.

146. Defendants were also aware that their unfair and deceptive acts and practices in violation of FDUTPA were directed at senior citizens, insofar as they marketed the Standard Neptune Plan and the Transportation and Relocation Protection Plan to senior citizens, and had knowledge that customers to which they were selling the plans were themselves over the age of 60 because the Neptune Society forms that customers filled out required them to provide the beneficiary's date of birth.

147. As a direct and proximate result of Defendants' FDUTPA violations, Plaintiff and members of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class have been damaged in an amount to be proven at trial, and have monetary, out-of-pocket losses or potential losses for which they are entitled to damages and/or injunctive relief, as they paid money to Defendants as a result of its deceptive conduct.

148. Plaintiff and members of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class are entitled to actual damages, declaratory and injunctive relief, attorneys' fees and costs, and all other remedies available under FDUTPA.

149.     Furthermore, civil penalties under Fla. Stat. § 501.2077 in an amount not to exceed $15,000 for each such violation against Plaintiff and all other senior citizen members of the classes should be assessed against Defendants, and made payable as required to "the Legal Affairs Revolving Trust Fund of the Department of Legal Affairs and allocated solely to the Department of Legal Affairs for the purpose of preparing and distributing consumer education materials, programs, and seminars to benefit senior citizens, persons who have a disability, and military service members or to further enforcement efforts."

<u>**COUNT II**</u>
**VIOLATION OF THE FLORIDA FUNERAL, CEMETERY, AND CONSUMER SERVICES ACT**

150.     Plaintiff incorporates paragraphs 1-137 above as if fully set forth herein and further alleges the following.

151.     The Florida Funeral, Cemetery, and Consumer Services Act, FL. Stat. 497.001, *et seq.*, provides a private right of action for any consumer against a person or entity violating its provisions, or regulations promulgated thereunder by the Florida Division of Funeral, Cemetery, and Consumer Services.

152.     Defendants have violated the Florida Funeral, Cemetery, and Consumer Services Act and its associated regulations by, *inter alia*, advertising their goods and services in a deceptive and/or misleading manner, by advertising their goods and services in a manner that omits material information, by advertising their goods and services in a manner that has a capacity or tendency to mislead or deceive by making only a partial disclosure of relevant facts, by advertising their goods or services in a manner that has the capacity or tendency to create false or unjustified expectations, and by advertising in a manner that contains, false, deceptive, or misleading representations relating to the quality of goods or services offered.

153.    Neptune Society advertises to their customers pre-purchase that their funds will be placed into a trust fund, that the cremation merchandise included in the Standard Plan has a retail value of more than $1,000, and that a customer's purchase of a Standard Plan is equivalent to or better than a purchase of the direct cremation plan and is comprised of a single package, when in reality the merchandise is nearly worthless, the customer will have to sign two separate but tied contracts with Neptune Society, and Neptune Society will reach the desired price by heavily discounting the cremation services that are trustable and cancellable anytime while simultaneously requiring the purchase of grossly inflated merchandise that is not cancellable after thirty days and that is not trustable.

154.    Defendants further deceive, mislead, and/or create unjustified expectations by not indicating that they are charging any sales tax on the Retail Merchandise Agreement (and not paying sales tax to the state) for the merchandise purchase, which provides the indication and/or is an admission that the merchandise purchase is collateral to the purchase of the cremation services and/or has no true retail value.

155.    Defendants also violate the Florida Funeral, Cemetery, and Consumer Services Act by failing to include on the Neptune Society signature page in boldfaced typeface 10-point type or larger, as required under Fla. Stat. § 497.468(7), the specific amount to be trusted and the specific amounts to be refunded upon contract cancellation if cancelled after 30 days.

156.    Indeed, the cancellation language on the signature page of Neptune Society's Preneed Funeral Agreement creates the deceitful, misleading, and/or unjustified expectation that a full refund of the services portion of the Standard Neptune Plan is only available if it is cancelled within 30 days.

157.     The Neptune Society contracts that Defendants required Plaintiff and each member of the Standard Neptune Plan Purchaser class to execute as part of their purchase of the Standard Neptune Plan are void as against public policy, insofar as they conflict with and frustrate the purposes of Florida statutes, specifically Fla. Stat. §§ 497.450-497.468, which govern the sale of preneed cremation contracts, the trust treatment of funds received for preneed cremation contracts, and the refunds of such funds in the event of cancellation.

158.     As a result of Defendants' violations above, Plaintiff was deceived, misled, and/or had unjustified expectations. Plaintiff believed the purchase of the Standard Neptune Plan was equivalent to or better than the purchase of the advertised direct cremation package with no appreciable downsides and that the included merchandise was not worthless or nearly worthless. Plaintiff also believed that she could only receive a full refund if she cancelled the Preneed Funeral Agreement within 30 days, despite state law requiring that a full refund (minus certain processing fees) of the services portion of a preneed agreement be available upon cancellation at any time.

159.     As a result, Plaintiff contracted to purchase the Standard Neptune Plan and thereby suffered damage by being induced to enter contracts she otherwise would not have agreed to, and is unable to cancel the contract(s) at any time and receive the amounts to which she would have been entitled had she purchased the direct cremation package.

160.     Plaintiff and members of the Standard Neptune Plan Purchaser class are entitled to actual damages, declaratory and injunctive relief, attorneys' fees and costs, and all other remedies available.

## COUNT III
## UNJUST ENRICHMENT

161.     Plaintiff incorporates paragraphs 1-137 above as if fully set forth herein and further alleges the following.

162.    Plaintiff and each member of the Standard Neptune Plan Purchaser class conferred a direct benefit on Defendants through their payment for a preneed contract, which Defendants enriched themselves with to the detriment of the class by wrongfully attributing an excessive amount of that payment towards non-refundable "merchandise" rather than towards refundable "services," which would have been required to have 70% of which held in trust.

163.    The Neptune Society contracts that Defendants required Plaintiff and each member of the Standard Neptune Plan Purchaser class to execute as part of their purchase of the Standard Neptune Plan are void as against public policy, insofar as they conflict with and frustrate the purposes of Florida statutes, specifically Fla. Stat. §§ 497.450-497.468, which govern the sale of preneed cremation contracts, the trust treatment of funds received for preneed cremation contracts, and the refunds of such funds in the event of cancellation.

164.    Plaintiff and each member of the Transportation and Relocation Protection Plan Purchaser class conferred a direct benefit on Defendants through their payment for the Transportation and Relocation Protection Plan, a portion of which Defendants wrongfully collected and retained as an undisclosed financial interest beyond the amount they remitted to MASA as the fixed, set cost of each Plan, and which they enriched themselves with to the detriment of the class.

165.    The contract that Neptune Society required Plaintiff and each member of the Transportation and Relocation Protection Plan Purchaser class to execute as part of their purchase of the Transportation and Relocation Protection Plan is void as against public policy, insofar as Defendants failed to disclose to customers that they were collecting and retaining an undisclosed financial interest on each sale of the plan above the fixed, set amount they were remitting on each

plan to MASA, and misled customers into believing that the cost of the plan was a pass-through of MASA's costs directly to the customers.

166.     Defendants appreciated, accepted, and retained these benefits from the Standard Neptune Plan and Transportation and Relocation Protection Plan, as they garnered substantial profits by virtue of these schemes.

167.     Under the circumstances, it would be unjust and inequitable to allow Defendants to retain these benefits, as they were obtained through deceptive representations and illegal conduct.

168.     Plaintiff and the class suffered damages as a result of Defendants' unjust enrichment.

<u>**COUNT IV**</u>
**DECLARATORY JUDGMENT**

169.     Plaintiff incorporates paragraphs 1-137 above as if fully set forth herein and further alleges the following.

170.     Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute. This Court sitting in diversity also has the power under Fla. Stat. § 86.012 to provide declaratory judgment regarding any question of construction or validity arising under a contract (such as the contracts involved in the Standard Neptune Plan) affected by a statute.

171.     Plaintiff and the Standard Neptune Plan Purchaser class seek a declaratory judgment that Defendants' practice of utilizing two separate but tied Neptune Society contracts to discount the amount paid for cremation services that are trustable, cancellable, and fully refundable anytime while simultaneously requiring the purchase of grossly inflated merchandise that is neither cancellable after 30 days nor trustable violates public policy and the Florida Funeral, Cemetery, and Consumer Services Act, Fla. Stat. § 497.001, *et seq.*,

172.    An actual case or controversy exists regarding Plaintiff's and the Standard Neptune Plan Purchaser class members' rights and Defendants' obligations to allocate appropriate amounts into trust, and to refund Plaintiff and Standard Neptune Plan Purchaser class members the amounts that should have been, but were not, properly allocated to preneed cremation services in the event of cancellation.

173.    Plaintiff and the Standard Neptune Plan Purchaser class should be awarded declaratory relief that: (1) Defendants' contracts under the Neptune Society Standard Neptune Plan violate public policy and the Florida Funeral, Cemetery, and Consumer Services Act, Fla. Stat. § 497.001, *et seq.*; (2) that Defendants should be required to allocate the appropriate amounts into trust; (3) that Plaintiff and Class members should be entitled to a full refund of the amount that should have been properly allocated to preneed cremation services in the event of cancellation; and (4) any other declaratory and/or injunctive relief that is warranted pursuant to such declaratory judgment.

## COUNT V
## CIVIL CONSPIRACY

174.    Plaintiff incorporates paragraphs 1-137 above as if fully set forth herein and further alleges the following.

175.    This count is for civil conspiracy to commit unlawful acts that were committed in the State of Florida, including the unfair and deceptive acts and practices alleged above.

176.    As outlined in paragraph 32, Defendants agreed to commit the unfair and deceptive acts and practices alleged above as evidenced by each of Service Corp.'s subsidiaries and affiliates engaging in identical sales and marketing practices nationwide.  On information and belief, Service Corp. is aware of the sales and marketing practices used by its affiliates and subsidiaries, which have overlapping board members and officers, and was therefore also aware of the bait-and-switch

practices involving the Standard Neptune Plan and the commission practices involving the Transportation and Relocation Protection Plan, and Service Corp. assisted in carrying out these unlawful schemes by its subsidiaries, including SCI Direct, Inc. and Neptune Society Management Corporation. The websites through which Neptune Society in part carries out its unlawful scheme provides that it is offered by SCI Direct's corporate parents, which includes Service Corp., and other unrelated Service Corp. affiliates offer separate websites recruiting sales and marketing employees for Neptune Society.

177.    SCI Direct, Inc. and Neptune Society Management Corporation committed overt acts in furtherance of the conspiracy in the State of Florida, including but not limited to marketing toward Florida residents, sending communications to Florida residents in the State of Florida, and selling Florida residents the Standard Neptune Plan and Transportation and Relocation Protection Plan.

178.    As a direct and proximate result of the acts and practices done under the conspiracy, including the FDUTPA and statutory violations alleged above, Plaintiff, members of the Standard Neptune Plan Purchaser class, and members of the Transportation and Relocation Protection Plan Purchaser class have been damaged in an amount to be proven at trial, and have monetary, out-of-pocket losses or potential losses for which they are entitled to damages and/or injunctive relief, as they paid money to Defendants as a result of the deceptive conduct undertaken as part of the conspiracy.

## **PRAYER FOR RELIEF**

Named Plaintiff and the plaintiff class request the following relief:

    a.   Certification of the class;

    b.   A jury trial and judgment against Defendants;

c.  An order requiring Defendants to make an accounting of all preneed contracts that they entered into with the Standard Neptune Plan Purchaser class, and to reapportion the amounts collected properly between fully refundable services and merchandise and deposit such funds as necessary following such an accounting in trust;

d.  An order entitling every member of the Standard Neptune Plan Purchaser class and the Transportation and Relocation Protection Plan Purchaser class to rescission of their agreements and restitution of the full purchase price of said plans (minus the wholesale cost to Defendants of any merchandise provided), at the option of the classes' members;

e.  An order refunding the amounts paid on behalf of any merchandise for any class member who cancelled their prepaid cremation services within the class period;

f.  An order requiring Defendants to make full disclosure to consumers of its receipt or retention of profits from the sale of the Transportation and Relocation Protection Plan, and the amount of such undisclosed financial profits;

g.  Entering a Declaratory Judgment as follows: Defendants' practice of utilizing two separate contracts to discount the amount paid for cremation services that are trustable, cancellable, and fully refundable anytime while simultaneously requiring the purchase of grossly inflated merchandise that is neither cancellable after 30 days nor trustable violates public policy and the Florida Funeral, Cemetery, and Consumer Services Act, FL. Stat. 497.001, *et seq.*, and every member of the Standard Neptune Plan Purchaser class is entitled to reformation of their agreements to reapportion the amounts collected properly

between fully refundable services and merchandise, and is entitled to a refund of the amount properly allocated to cremation services in the event of cancellation;

h.  The costs of suit, including reasonable attorneys' fees, in accordance with FDUTPA, the Funeral, Cemetery, and Consumer Services Act and otherwise;

i.  General, actual, and compensatory and exemplary damages in an amount to be determined at trial, including but not limited to the civil penalties authorized under Fla. Stat. § 501.2077 for each violation involving a senior citizen over the age of 60;

j.  Restitution of the amount Defendants were unjustly enriched as a result of the wrongs alleged herein, in an amount to be determined at trial ;

k.  Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law; and

l.  Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial as to all claims so triable.

Dated: July 10, 2020

Respectfully submitted,

**/s/ Randall P. Ewing, Jr.**
Randall P. Ewing, Jr.
Fla. Bar No. 76879
Chad E. Bell
KOREIN TILLERY LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Phone: (312) 641-9750
Fax: (312) 641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com

Stephen M. Tillery
Carol L. O'Keefe
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Phone: (314) 241-4844
stillery@koreintillery.com
cokeefe@koreintillery.com

Alec H. Schultz
Fla. Bar No. 35022
John R. Byrne
Fla. Bar No. 126294
Jeremy L. Kahn
Fla. Bar No. 105277
LEÓN COSGROVE, LLP
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Tel: (305) 740-1975
aschultz@leoncosgrove.com
jbyrne@leoncosgrove.com
jkahn@leoncosgrove.com

*Counsel for Plaintiff and Classes*